**UNITED STATES of America, Appellee,**

v.

**Joseph LOVELOCK, Defendant–Appellant.**

**Docket No. 98–1463.**

United States Court of Appeals, Second Circuit.

Argued Feb. 18, 1999.

Decided March 16, 1999.

---

Robert B. Buehler, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney for the Southern District of New York, Dietrich L. Snell, Assistant United States Attorney, New York, New York, on the brief), for Appellee.

Darrell B. Fields, New York, New York (The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, New York, on the brief), for Defendant–Appellant.

Before: KEARSE and SACK, Circuit Judges, and STEIN, District Judge.*

KEARSE, Circuit Judge:

Defendant Joseph Lovelock appeals from a judgment entered in the United States District Court for the Southern District of New York following a bench trial before Harold Baer, Jr., *Judge,* convicting him of fraud in connection with telecommunications access devices, in violation of 18 U.S.C. § 1029(a) (1994), and sentencing him principally to 15 months' imprisonment, to be followed by a three-year term of supervised release. On appeal, Lovelock contends that the district court erred in denying his pretrial motion to suppress evidence as the product of an unlawful entry into his apartment. The district court ruled that the entry was lawful because the officers were attempting to execute an arrest warrant for a person other than Lovelock and reasonably believed that other person to live in the apartment. For the reasons that follow, we affirm.

---

* Honorable Sidney H. Stein, of the United States District Court for the Southern District of New York, sitting by designation.

## BACKGROUND

The present prosecution was begun after New York City police officers, attempting to execute a warrant for the arrest of a person other than Lovelock, discovered in an attic apartment at 744 East 229th Street in the Bronx a variety of paraphernalia for the creation of counterfeit checks and the falsification of credit cards and cellular-telephone identification numbers. Prior to trial, Lovelock moved to suppress the physical evidence, as well as certain statements he made to the officers, on the ground that he was a resident of the apartment and their entry into the apartment was unlawful. At the suppression hearing, the government's evidence as to the events leading to the entry was presented principally through the testimony of Police Sergeant Mary Dingler and Detective Thomas Gervasi. The evidence, taken in the light most favorable to the government, included the following.

Dingler, a supervisor of the Bronx Warrant Squad, testified that each Warrant Squad team of approximately six officers would typically receive 50 or more arrest warrants to execute in a given week. The teams attempted each day to execute all of the warrants that had been issued on the previous day; they set out very early each morning because this increased their chances of finding the suspect at home. On November 9, 1995, Dingler's team received from the New York Supreme Court a warrant, issued on November 8, for the arrest of one Jon Williams, who had been convicted of criminal possession of a weapon and who was alleged to have violated his probation. A photograph of Williams was attached. The warrant listed Williams's "residence address" as "744 E 229th St.," "Bronx, N.Y."

The warrant showed a different address as a "[p]rior address," which, according to a computer printout of Williams's arrest report, had been his address at the time of his arrest in 1994. The officers believed that the "residence address" shown on the warrant, 744 East 229th Street, was likely Williams's current residence because warrants issued

for violations of probation ("probation warrants") normally "have pretty accurate information because the defendant sees his probation officer on a regular basis and has to notify his probation officer of any changes in his address...." (Hearing Transcript, September 25, 1996 ("Tr."), 17; *see also* Tr. 21 ("probation warrants usually have new and updated information on them").)

On November 9, a five-officer team headed by Dingler began its attempts to execute warrants at about 4:30 a.m. Between 7 and 8 a.m., they arrived at 744 East 229th Street seeking to arrest Williams. The building at that address appeared to be a two-family house. The officers first made inquiry of the tenant of the first floor apartment. Dingler testified, "We asked her if she recognized the photo and if he resided in the building and when we asked her if he resided in the building she said 'he stays in the attic.'" (Tr. 62.) The officers then went to the second floor and inquired of the tenant living there. The second-floor tenant, shown the photograph of Williams, said "'He stays with Joe upstairs.'" (Tr. 26.) The officers understood these responses, in light of the "residence address" shown on the arrest warrant, to mean that Williams resided in the attic apartment. (*See, e.g.,* Tr. 52. (Dingler: "I had in fact all reasons to believe he did live there. I had two independent people telling me he did, along with the probation report."); Tr. 106. (Gervasi: "I have a warrant here with his address on it so when somebody says 'he goes to the attic' and I have it as his residence that he gave to the Department of Probation, I believed that he is living there.").)

The officers then went up to the attic, where they found the door slightly ajar and hence believed that Williams either was inside or had learned that the officers were there and was fleeing through a rear exit. Knowing that Williams had been convicted of criminal possession of a weapon, the officers entered the attic apartment without knocking or announcing themselves. They found no persons in the apartment, but in the center of the floor in the main room they saw numerous electronic devices, including computers, printers, copying machines, and cellular telephones, and "all kinds of checks that were already written and blank checks." (Tr. 32.) The officers promptly placed calls to the computer fraud unit, the Bronx District Attorney's Office, the Federal Bureau of Investigation, and the United States Secret Service.

Two officers, including Gervasi, then remained in the apartment, while others went outside to maintain surveillance of the building. Gervasi, looking out the window, saw Lovelock arrive at the building some three hours later; without knowing his name, Gervasi recognized him because photographs of him were on the floor of the attic apartment. When Lovelock entered the apartment, he was arrested. He and the paraphernalia found in the apartment were eventually turned over to the Secret Service.

On cross-examination of the officers, Lovelock's attorney brought out that before going out to execute arrest warrants at 4:30 a.m. on November 9, the officers did not call Williams's probation officer to inquire when he or she had last spoken to Williams or how recently Williams had given the 744 East 229th Street address as his residence; that they did not attempt to cross-check that address against listed telephone numbers to determine whether Williams had a telephone listed to him at that address; and that they did not seek information from postal employees as to whether there had been any recent deliveries to Williams at that address. Lovelock contended that the officers did not have good reason to believe either that Williams lived at that address or that he was present in the attic apartment when they arrived there.

In an Opinion and Order reported at 1997 WL 4574 (Jan. 7, 1997), the district court denied the motion to suppress, noting that "'[a]gents may enter a suspect's residence, or what they have reason to believe is his residence, in order to effectuate an arrest warrant where a reasonable belief exists that the suspect is present.'" 1997 WL 4574, at *2 (quoting *United States v. Lauter,* 57 F.3d 212, 214 (2d Cir.1995)). The court stated:

I find that under this standard the officers here had the requisite reasonable belief that (1) Williams resided in the attic

apartment and (2) that he was home at the time they entered it. As to the first prong, both Sergeant Dingler and Detective Gervasi testified that they believed Williams resided in the building based on the information in the arrest warrant, the fact that it was a probation warrant (which suggests that the address listed is accurate), and the interviews with the other tenants in the building who recognized Williams' photograph and indicated that he lived in the attic apartment.... As to the second prong, Sergeant Dingler testified that the statements of the two tenants led her to believe that Williams was in the apartment.... She explained that in general the Warrant Squad attempts to execute its warrants early in the morning when suspects are not yet up and out of the house, and there is a better chance at successful execution.... Courts have recognized that once police officers have reason to believe that a suspect lives in a particular dwelling, they may reasonably infer that he will be home early in the morning. *See United States v. Terry*, 702 F.2d 299, 319 (2d Cir.) (finding that officers could reasonably believe a suspect would be home at 8:45 A.M. on a Sunday morning), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).... Further, both witnesses testified that they believed that Williams was in the apartment because the door was open.... I find that this inference was reasonable. 1997 WL 4574, at *2. The court found that the officers' efforts to determine Williams's current residence were reasonable and that further efforts were not necessary. *Id.* at *2–3.

The court adhered to its decision on reconsideration, and the challenged evidence was admitted at Lovelock's trial. Lovelock was convicted and sentenced as indicated above; this appeal followed.

## DISCUSSION

On appeal, Lovelock contends principally (1) that the police had notice that they might be entering the residence of a person other than Williams, and hence their entry was unlawful under the principle announced in *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); and (2) that the district court erred in finding that the officers had a reasonable belief that Williams resided at 744 East 229th Street. We reject all of his contentions.

■ "[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The rationale is that where "there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that [the suspect's] arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law." *Id.* at 602–03, 100 S.Ct. 1371.

■ In *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir.1995), we stated that in order to authorize entry into a person's home to execute a warrant for his arrest, the officers' belief that the residence to be entered is the home of the person named in the warrant need not be supported by "probable cause." Rather, "the proper inquiry is whether there is a *reasonable belief* that the suspect resides at the place to be entered to execute [the] warrant, and whether the officers have reason to believe that the suspect is present." *Id.* (emphasis in original). *Accord United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir.) (reversing grant of motion to suppress, stating that "in order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry"), *cert. denied*, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995).

■ Nor need the officers' belief, if reasonable, be correct. What a citizen is "assured by the Fourth Amendment ... is not that no government search of his house will occur" in the absence of a warrant or an applicable exception to the warrant require-

ment, "but that no such search will occur that is 'unreasonable.'" *Illinois v. Rodriguez*, 497 U.S. 177, 183, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (consent exception); *see, e.g., Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) ("The touchstone of the Fourth Amendment is reasonableness."). If the circumstances are such that a reasonable person would doubt a given representation, the officers cannot reasonably act upon that representation without further inquiry, *see, e.g., Illinois v. Rodriguez*, 497 U.S. at 188–89, 110 S.Ct. 2793; but the constitutional requirement is that they have a basis for a reasonable belief as to the operative facts, not that they acquire all available information or that those facts exist, *see, e.g., id.* at 185–86, 110 S.Ct. 2793; *United States v. Risse*, 83 F.3d 212, 216 (8th Cir.1996); *United States v. Magluta*, 44 F.3d at 1533–36.

■ The principle discussed in *Payton*, allowing officers to enter the residence of the suspect named in the arrest warrant, does not authorize entry into a residence in which the officers do not believe the suspect is residing but believe he is merely visiting. *See Steagald v. United States*, 451 U.S. at 213–14 & n. 7, 101 S.Ct. 1642, 68 L.Ed.2d 38. *Steagald* did not, however, prohibit entry into a residence reasonably believed to belong to the person named in the arrest warrant. The Court ruled that officers seeking to execute an arrest warrant for one Ricky Lyons needed in addition a search warrant (or *Steagald's* consent) in order to execute the arrest warrant in the residence not of Lyons but of Steagald. While noting *Payton*'s statements that an arrest warrant authorizes officers to enter the suspect's own home to execute the warrant when there is reason to believe he is there, *see Steagald*, 451 U.S. at 214 n. 7, 101 S.Ct. 1642, the Court explained that the agents in *Steagald* had "sought to do *more* than use the warrant to arrest Lyons ... in *his* home; instead, they relied on the warrant as legal authority to enter the home of a third person based on their belief that Ricky Lyons might be a *guest* there." *Id.* at 213, 101 S.Ct. 1642 (emphases added). The Court noted that "the situations in which a search warrant will be necessary are few. As noted in *Payton v. New York*, [445 U.S.]

at 602–603, 100 S.Ct. 1371, an arrest warrant alone will suffice to enter a suspect's own residence to effect his arrest." *Steagald*, 451 U.S. at 221, 101 S.Ct. 1642.

■ In the present case, to the extent that Lovelock argues that the entry into the attic apartment at 744 East 229th Street was unlawful because the officers should have inferred that Williams was no longer a resident there and Lovelock was a successor tenant, or that Williams was merely a guest, the record does not support his factual premises. Though Lovelock attempts to segment, isolate, and minimize each item of evidence that contributed to the existence and reasonableness of the officers' belief on November 9 that Williams resided at that address, the totality of the information possessed by the officers gave them no reason to doubt that Williams was then a resident of the attic apartment. The information included the facts that 744 East 229th Street was shown on the arrest warrant as Williams's residence address; that address was more current than the address at which he had lived at the time of his arrest; that probationers are required to report to their probation officers any change of residence; that probation warrants, of which this was one, commonly showed current addresses when issued; and that the warrant for Williams had been issued only the day before.

The reasonableness of believing that the "residence address" shown on the arrest warrant was current was buttressed by the responses of the other two tenants at 744 East 229th Street. We reject Lovelock's argument that the tenants' use of the word "stays," in responding to the question whether Williams resided at 744 East 229th Street, was either unresponsive or too ambiguous to permit reasonable reliance. The colloquial use of that word is consistent with "resides"; and that interpretation by the officers was especially appropriate in light of the fact that Williams apparently had informed the Probation Department that 744 East 229th Street was his residence. *See, e.g., United States v. Risse*, 83 F.3d at 216–17 (suspect's "colloquial" statement to officers that she was "'staying with' Risse" was reasonably interpreted

"to mean that [suspect] was in fact living with Risse"). Finally, it is noteworthy that both of the tenants questioned at that address, when asked whether Williams resided there, answered affirmatively in the present tense. One tenant pointed up toward the attic as she spoke; the other said that Williams "stays with" Joe, not that Williams formerly lived where Joe lives now. Thus, the record showed nothing from which the officers should have inferred that Williams no longer lived at the most recent address given to the Probation Department.

To the extent that Lovelock argues instead that the officers could not permissibly enter the attic apartment seeking Williams because they had received a suggestion that someone else lived there in addition to Williams, that contention is insupportable as a matter of law. The "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *see Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). A person who occupies premises jointly with another has a reduced expectation of privacy since he assumes the risk that his house-mate may engage in conduct that authorizes entry into the premises. *See, e.g., United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (consent of cohabitant validates search since "it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched"); *United States v. Risse*, 83 F.3d at 216 n. 3 (arrest warrant for cohabitant validates entry because "where a homeowner allows another person to possess common authority over, or some other significant relationship to, the premises to be searched, the homeowner is held to have a lower expectation of privacy"); *United States v. Chaidez*, 919 F.2d 1193, 1202 (7th Cir.1990) (cohabitant has no reasonable expectation of privacy because his privacy is "contingent in large measure on the decisions of another. Decisions of *either* person define the extent of the privacy involved, a principle that does not depend on whether the stranger welcomed into the house turns out to be an agent or another drug dealer." (emphasis in original)), *cert. denied*, 502 U.S. 872, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991); *United States v. Litteral*, 910 F.2d 547, 553 (9th Cir.1990) ("if the suspect is a co-resident of the third party, then *Steagald* does not apply, and *Payton* allows both arrest of the subject of the arrest warrant and use of evidence found against the third party").

In sum, the requirement that the person named in an arrest warrant "open his doors to the officers of the law," *Payton*, 445 U.S. at 603, 100 S.Ct. 1371, does not allow a house-mate to keep those doors shut.

## CONCLUSION

We have considered all of Lovelock's arguments on this appeal and have found them to be without merit. The judgment of conviction is affirmed.