United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 5, 2006**

Charles R. Fulbruge III
Clerk

REVISED SEPTEMBER 12, 2006

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 05-40460

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

versus

JUAN GERARDO BARRERA,

Defendant – Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before KING, STEWART, and DENNIS, Circuit Judges

CARL E. STEWART, Circuit Judge:

Juan Gerardo Barrera ("Juan") was indicted for possession of a firearm by a convicted felon. In the trial court, he moved to suppress the evidence that formed the basis for his arrest, arguing that, by entering his home without a warrant for his arrest, probable cause, or other lawful authority, law enforcement officers violated his Fourth, Fifth, Sixth, and Fourteenth Amendment rights. The district court denied Juan's motion to suppress and sentenced him to fifty-seven months imprisonment to be followed by three years of supervised release. Juan appeals, renewing the merits of his previous motion to suppress and arguing that the law enforcement officers who entered his residence did not

conduct sufficient due diligence and, therefore, had no reasonable belief that his brother Jose Humberto Barrera ("Jose") lived at the residence or was inside when they executed the arrest warrant at Juan's home. For the following reasons, we affirm the district court's denial of the motion to suppress, holding it was not clearly erroneous.

## FACTUAL AND PROCEDURAL BACKGROUND

The following events transpired as a result of a warrant received and executed by Deputy United States Marshal Alejandro Ramos ("Ramos") for Jose Barrera; Juan, Jose's brother and the subject of this appeal, was never the focus of Ramos's investigation. Ramos testified at Juan's suppression hearing that, on October 9, 2003, he attempted to execute an arrest warrant for Juan's brother, Jose, a drug trafficker known to carry a weapon. In compiling research on Jose, Ramos discovered that Jose's official address, as reported by his probation officer, was 1222 St. Patrick Street, the home of Jose's mother. A visit to that address revealed that Jose no longer lived there.

Ramos later learned that Jose had been arrested earlier that year at 1209 St. Michael Street ("St. Michael") and that a bail bondsman through which Jose had made bond confirmed that Jose had given the St. Michael address as his place of residence. Furthermore, a Laredo police officer told Ramos that Jose was known to drive an orange Hummer, an orange Corvette or a pearl Escalade and that after Jose's Hummer was stolen and recovered, Juan had paid to retrieve it from the impound.

2

After gathering this information, Ramos acted fast,[1] relying primarily on his leads and conducting little further research regarding Jose's whereabouts. On October 9, 2003, the Laredo Police Department ("LPD") advised Ramos that all three vehicles suspected to belong to Jose were at the St. Michael location. While in route to St. Michael, the LPD informed Ramos that one of the Barrera brothers had left the residence in the Corvette. Therefore, when Ramos saw the Corvette, he conducted a traffic stop; the stop revealed that the driver was Mauro Barrera ("Mauro"), the brother of Juan and Jose. Mauro agreed to accompany Ramos and approximately five other law enforcement officers back to the St. Michael residence; Mauro explained that the house belonged to Juan, who was present at the residence, but that he had not seen Jose.

Thereafter, the officers arrived at the residence and surrounded it. There was no answer to the officers' knocking on the door, nor did anyone respond to a phone call made by Mauro to the residence. After approximately fifteen minutes had elapsed, Juan answered the door wrapped in a towel. He was surprised to see the officers and began backing away from the door with his hand behind his back. As Juan stepped backwards, Ramos heard something drop, but was unable to see

---

[1]Juan, on the other hand, argues that Ramos's due diligence and research was conducted and gathered quickly and sloppily. For example, Ramos testified that he did not personally observe Jose at the St. Michael address nor did he conduct long-term surveillance. He also did not ascertain the name of the record owner of 1209 St. Michael prior to searching the residence. Ramos failed to document in his arrest report the source of the leads/tips he had received about Jose. Furthermore, the paper license plate on the Hummer did not identify the owner, and Ramos did not call the dealer that sold the Hummer to ascertain the name of the owner; a subsequent investigation revealed that the three vehicles were not actually registered to any of the Barrera brothers. As we will explain, however, viewing the record in the light most favorable to the government, we agree with the district court that Ramos's investigation was sufficient.

what it was. Officer Jorge Medina of the LPD ("Medina") then advised Juan to step to the side and to identify the item that was dropped.[2]

At that point, Officers Medina and Chavez entered the residence without seeking permission and retrieved the firearm from the floor. Juan was cooperative; he made no attempt to close the door and gave Ramos permission to search his residence. His consent, however, was sought by Ramos after the officers had already entered the residence. Juan also advised the officers that Jose was in Cancun, Mexico. A search of Juan's residence did not lead the officers to Jose; however, the officers observed what was later determined to be $10,000 on Juan's bed and a closed briefcase containing a firearm inside a closet in the bedroom. At that point, Ramos asked Juan if he was on probation or had a criminal history and Juan advised Ramos that he was on probation for attempted murder. Before that conversation, Ramos was unaware that Juan had a felony conviction. Ramos then notified ATF Agent David Martinez[3] that weapons had been found at Juan's residence and continued searching Juan's residence.

Thereafter, Juan was indicted for possession of a firearm by a convicted felon. He moved to suppress the evidence that formed the basis for his arrest, arguing that, by entering his home without a warrant for his arrest, probable cause, or other lawful authority, law enforcement officers violated his Fourth, Fifth, Sixth, and Fourteenth Amendment rights. At the suppression hearing, Medina testified that it was he who told Ramos that Jose previously had been arrested at the St. Michael residence, and that he did so prior to the search of the residence in October 2003. Medina also explained that he had not observed Jose at that address since his arrest in May 2003. Moreover,

---

[2] Juan testified at trial that he responded that the item was a firearm.

[3] Martinez executed an arrest warrant for Juan on June 10, 2004.

4

Medina stated that when Juan opened the door, Medina identified himself and Juan began to back away from the door with his right hand next to his right leg. Though Medina explained that he did not see what Juan held in his hand, he testified that he believed Juan had moved back because he was wearing a towel, until he heard a "clank." Medina testified that, at that point, he stepped inside the doorway to recover the firearm for safety purposes.

During Ramos's testimony at the suppression hearing, he pointed out, in addition to the factual occurrences at Juan's residence, that he was aware that the presence of a handgun inside a residence alone is not a sufficient basis to justify entering a residence; however, Ramos explained that because he had an arrest warrant for an individual, he actually did not need permission to enter the residence. Therefore, Ramos clarified his statement, stating that his asking permission to enter Juan's residence was not required by law but instead was a personal practice and if Juan had not given him permission to search his home, Ramos would have searched it anyway. Finally, Ramos testified that when he entered the residence, he: (1) did not believe that there was a possibility that any evidence would be removed or destroyed if he had to wait for a search warrant; (2) was not in hot pursuit of a suspect; and (3) did not believe that there was an immediate risk to the officers based on activity inside the residence.[4]

The district court ultimately denied the motion to suppress, even though it found that Juan did not give the officers consent to enter his residence and no exigent circumstances justified entry into the residence. It held that the arrest warrant for Jose was sufficient to allow the officers to enter Juan's residence. The court reasoned that because Ramos had received information that (1) on or

---

[4]Medina also made similar statements, agreeing that hot pursuit, officer safety, or destruction of evidence was not an issue in this case.

prior to October 9, 2003, Jose had been arrested at the St. Michael location; (2) a bail bondsman had reported that Jose previously had listed the St. Michael location as his residence; (3) Jose's other known address was no longer valid; and (4) a Laredo police officer had advised that vehicles known to be used by Jose were present at the St. Michael location, it was reasonable for Ramos to believe that it was highly probable that Jose resided at and might be found at the St. Michael address.

The court found it inconsequential that, in hindsight, the information that Jose lived at the residence may have been incorrect, even though Jose had not been seen at the residence since May 2003. The court stated that "what makes the search or entry into the home valid was the fact that they were executing a valid arrest warrant, although for someone else, but once they have a legal right to enter the home and they talked to [Juan], and he admits that he had possession of the gun and had dropped the gun and they find the gun, I think one thing leads to another and validates legally whatever flowed from that." The district court also denied Juan's motion to reconsider the motion to suppress, essentially reiterating its previous ruling.

After a stipulated bench trial, the court found Juan guilty of possession of a firearm by a convicted felon. A probation officer prepared a Presentence Report (PSR) setting Juan's base offense level at 24. After reducing Juan's base offense level by three levels for acceptance of responsibility, Juan's total offense level of 21 and criminal history category of III yielded a guidelines range of imprisonment of 46 to 57 months of imprisonment. The district court sentenced Juan to 57 months of imprisonment to be followed by three years of supervised release. Juan filed a timely notice of appeal.

DISCUSSION

A. Standard of Review

When reviewing a district court's ruling on a motion to suppress, this court reviews questions of law de novo and factual findings for clear error. *United States v. Dortch*, 199 F.3d 193, 197 (5th Cir. 1999). This court views the evidence in the light most favorable to the party who prevailed in the district court. *Id.*

Furthermore, the court should review the district court's determination that law enforcement officers had an objectively "reasonable belief" that the individual mentioned in the arrest warrant resided at and was presently within a particular residence. *United States v. Route*, 104 F.3d 59, 62 (5th Cir. 1997). Like "reasonable suspicion" or "probable cause" the requirement that an officer have a "reasonable belief" is not a finely-tuned standard. *See Ornelas v. United States*, 517 U.S. 690, 696 (1996) (explaining that those terms are "commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act"). "Reasonable belief" can only be ascertained through a weighing of the facts in the record, as it is a "fluid concept[] that takes [its] substantive content from the particular contexts in which the standard[] [is] being assessed." *Illinois v. Gates*, 462 U.S. 213, 232(1983).

B.      Whether Ramos had a Reasonable Belief that Jose Resided at the St. Michael Address

Juan renews his challenge of the district court's denial of his motion to suppress, arguing that the law enforcement officers who entered his residence had no reasonable belief that Jose lived at the residence, nor that he was present within the residence. He further contends that the officers did not perform sufficient due diligence to form a reasonable belief that Jose lived at the residence and any inference the officers could have drawn from the facts amount to nothing more than a mere

7

assumption. He asserts that, absent exigent circumstances, the Fourth Amendment's protection against unreasonable searches and seizures demands that law enforcement seek a warrant prior to entering the home of a third party for whom a warrant has not been issued. Finally, he explains that because the officers did not seek a warrant to search his residence, the evidence obtained is the product of an unlawful warrantless search and should have been excluded.

The Government states that the district court's decision is correct and Ramos's investigation did create a reasonable belief because (1) Ramos was told that Jose had been arrested at St. Michael, (2) Jose's bail bondsman told Ramos that Jose had given St. Michael as his address, and (3) the officers eliminated the possibility that Jose lived at 1222 St. Patrick Street by going there and learning that he no longer lived there, the officers established a basis for the reasonable belief that Jose resided at 1209 St. Michael. The Government also explains that the officers had a reason to believe that Jose was in the house because the officers were told that several vehicles owned and used by Jose were parked in the vicinity of the St. Michael address on October 9, 2003, and "common sense supports the deputy's formulation of a reasonable belief that the subject of his arrest warrant would be in the dwelling around which his expensive vehicles were parked." Thus, it argues that because the officers had reason to believe that the subject of their arrest warrant resided and was inside of the St. Michael address, their entry into the dwelling and search of the premises did not "run afoul of the Fourth Amendment."

The Supreme Court has "consistently held that the entry into a home to conduct a search or make an arrest is unreasonable . . . unless done pursuant to a warrant" except when exigent circumstances are present. *Steagald v. United States*, 451 U.S. 204, 211-12 (1981). Furthermore, the Court has stated that "for Fourth Amendment purposes, an arrest warrant founded on probable

8

cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). *Payton*, however, did not define the "reason to believe" standard it discussed; this court in *Route*, 104 F.3d at 62, nonetheless, distinguished[5] it from the standard for probable cause and adhered to the articulation of the test for "reasonable belief" set forth in *United States v. Woods*, 560 F.2d 660 (5th Cir. 1977). In *Woods*, this court determined that "[r]easonable belief embodies the same standards of reasonableness [as probable cause] but allows the officer, who has already been to the magistrate to secure an arrest warrant, to determine that the suspect is probably within certain premises without an additional trip to the magistrate and without exigent circumstances." *Woods*, 560 F.2d at 665 (quotation and citation omitted). Furthermore, we held that courts should review the reasonableness of an officer's judgment. *Id.*

In *Route*, police officers executed a valid arrest warrant for the defendant, Route, outside of his residence. 104 F.3d at 61. During the arrest of a co-defendant, for whom officers also had a valid arrest warrant, officers found evidence incriminating Route inside the residence. *Id.* at 61-62. Route challenged the district court's denial of his motion to suppress evidence seized from the residence.

---

[5]Federal and state appellate courts that have addressed the reason to believe standard set forth in *Payton* have disagreed as to whether that standard should be explicitly characterized as equivalent to the probable cause standard. *United States v. Gorman*, 314 F.3d 1105, 1111-15 (9th Cir. 2002) (concluding reasonable belief standard in *Payton* embodies the same standard of reasonableness inherent in probable cause); *Valdez v. McPheters*, 172 F.3d 1220, 1224-25 (10th Cir.1999) (criticizing Ninth Circuit authority that had required showing of probable cause to believe defendant resided at location where arrest warrant executed); *Green v. State*, 78 S.W.3d 604, 612 (Tex. Ct. App. 2002) (distinguishing reasonable belief and probable cause). The disagreement among the circuits has been more about semantics than substance; the courts that distinguish the terms have done so because "probable cause" is a term of art. *Route*, 104 F.3d at 62. Even though they may distinguish the reasonable belief standard from probable cause, they also define the "reason to believe standard" as requiring that the officers reasonably believe that "the suspect is probably within" the premises. *Id.* (emphasis added).

9

*Id.* This court held that the search of Route's residence was supported by a valid arrest warrant for the co-defendant and by the officer's reasonable belief that the co-defendant lived at the residence and was within the residence at the time of entry. *Id*. at 62-63. This court concluded that the arresting officer had performed sufficient due diligence in concluding that the co-defendant lived at the residence because the co-defendant's credit card applications, water and electricity bills, vehicle registration, and mailing address confirmed that he lived at the residence. *Id.* This court further concluded that the officer's reasonable belief that the co-defendant was within the residence at the time of entry was confirmed by the presence of a vehicle in the driveway and noise from a television inside the residence. *Id*. at 63.

*Route* offers a standard for determining the amount of due diligence required to support a reasonable belief that a defendant lives at and is present within a residence. It is the sole published Fifth Circuit precedent addressing the issue; the courts in *United States v. Bervaldi*, 226 F.3d 1256 (11th Cir. 2000), and *United States v. Lovelock*, 170 F.3d 339 (2d Cir. 1999), however, have dealt with such issues in the same manner.

*Bervaldi* contains facts analogous to Juan's case and to *Route*; it is also illustrative of the applicable "reasonable belief" standard. In *Bervaldi*, police officers tried to execute a search warrant at Bervaldi's residence–but Bervaldi was not the subject of the warrant; Deridder was. 226 F.3d 1258. The officers decided to execute the warrant and knocked on Bervaldi's door for about ten minutes; finally, someone opened the door approximately a foot wide and when the officers identified themselves and noticed that the person peering behind the door had the same physique as Deridder, the officers kicked in the door. *Id*. Though they did not discover Deridder inside, they did detect the smell of marijuana as they conducted a protective sweep of the premises. When questioned about

10

the odor, Bervaldi consented to a search of his premises and showed the officers the sixty pounds of marijuana hidden in the kitchen cupboard, after which a few of the officers left to secure a search warrant. When they returned with a search warrant, a search was conducted that resulted in the discovery and seizure of, among other things, seventeen sealed baggies of marijuana, one kilogram of cocaine, three bags of cocaine cutting agent, $53,483 in cash and a semiautomatic pistol and rifle with ammunition. *Id*. at 1259. Bervaldi sought to suppress the evidence during his trial asserting that the officers did not have a reasonable belief that Deridder resided at Bervaldi's residence; the district court granted the motion. *Id*. at 1259, 1262. It weighed the evidence and found that even though the officers had searched vehicle registration records and determined that Deridder's car was in the vicinity of the residence, Bervaldi's presentation of utility records as well as a warranty deed with his name on it was more compelling. *Id*. at 1262. On appeal, the Eleventh Circuit reversed deeming the evidence, particularly the presence of Deridder's vehicle in the vicinity of Bervaldi's house as well as officers observing the subject leaving Bervaldi's house during surveillance, sufficient to amount to a reason to believe that Deridder resided and was inside the house upon the execution of the warrant. *Id.* at 1263-69.

Furthermore, as the district court noted, the Second Circuit's holding in *Lovelock* offers support for the district court's denial of Juan's motion to suppress. 170 F.3d 339. In *Lovelock,* New York City police officers attempting to execute an arrest warrant for a person other than Lovelock, discovered in an attic apartment at 744 East 229th Street in the Bronx a variety of paraphernalia for the creation of counterfeit checks and the falsification of credit cards and cellular-telephone identification numbers. *Id*. at 341. An officer involved in the search testified that the warrant was for the arrest of Jon Williams, who had violated his probation, and it listed Williams's "residence

11

address" as "744 E 229th St.," "Bronx, N.Y." *Id.* The officers believed this address to be Williams's address, and explained that violations of probation normally include accurate information because the defendant must report to his probation officer regularly and must notify the officer of any change of address. *Id*. at 341-42. When the officers arrived at the residence listed on the warrant, they showed a picture of Williams to a tenant on the first floor of the apartment building; the tenant identified the person in the picture as living in the attic of the building. *Id*. at 342. The officers made the same inquiry to a second floor tenant, who also responded that the man in the picture stayed upstairs. *Id*. The officers then went up to the attic, where they found the door slightly ajar and therefore believed that Williams either was inside or had learned that the officers were there and was fleeing through a rear exit. *Id.* Knowing that Williams had been convicted of criminal possession of a weapon, the officers entered the attic apartment without knocking or announcing themselves. *Id*. They found no persons in the apartment, but in the center of the floor in the main room they saw numerous electronic devices, including computers, printers, copying machines, and cellular telephones, and "all kinds of checks that were already written and blank checks." *Id*. The officers promptly placed calls to the computer fraud unit, the Bronx District Attorney's Office, the Federal Bureau of Investigation, and the United States Secret Service. *Id*. Two officers then remained in the apartment while others went outside to maintain surveillance of the building. *Id*. One officer, looking out the window, saw Lovelock arrive at the building some three hours later; the officer recognized Lovelock from a picture within the apartment. *Id*. Without knowing his name, the officers arrested Lovelock when he entered the apartment. *Id*.

Prior to trial, Lovelock moved to suppress the physical evidence, as well as certain statements he made to the officers, on the ground that he was a resident of the apartment and the officers' entry

into the apartment was unlawful. *Id.* He argued that the officers did not have a reasonable belief that Williams was inside of the residence because the officers did not contact Williams's probation officer to confirm the address, they did not contact postal employees to confirm if any recent deliveries were made to that address for Williams, and they did not attempt to cross-check that address against listed telephone numbers to determine whether Williams had a telephone listed to him at that address. *Id.* The district court denied the motion to suppress, noting that "'[a]gents may enter a suspect's residence, or what they have reason to believe is his residence, in order to effectuate an arrest warrant where a reasonable belief exists that the suspect is present.'" *Id.* The Second Circuit affirmed, holding that "the totality of the information possessed by the officers gave them no reason to doubt that Williams was then a resident of the attic apartment." *Id.* at 344.

Additionally, in reaching its conclusion, the Second Circuit in *Lovelock* distinguished the facts in its case from the facts presented in the Supreme Court's *Steagald,* 451 U.S. 204 (1981), decision. 170 F.3d at 344. In *Steagald*, Drug Enforcement Agents ("DEA") sought to execute a six-month-old arrest warrant. 451 U.S. at 206. A confidential informant advised the agents that the subject of the warrant could be located at a telephone number; the DEA used the phone number to secure an address for the subject of the arrest warrant. *Id.* Two days later, eleven agents went to the address given to them by the phone company, drew their weapons at two men standing outside of the house, and eventually searched them. *Id.* When neither of the men proved to be the subject of the arrest warrant, several agents went into the house for a more thorough search for the subject of the arrest warrant. *Id.* Instead, the officers ran across a substance they believed to be cocaine; at that point, an officer was dispatched to secure a search warrant. *Id.* Officers did not stop searching the house, however; the search continued, even while the officer was working to obtain the warrant. *Id.* at 206-

13

07. Eventually, the officers discovered approximately forty-three pounds of cocaine. *Id.* at 207. The defendants moved to suppress the evidence and the district court denied this motion finding that the arrest warrant allowed entry into the house and the subsequent search. *Id.* This court affirmed. *Id.* The Supreme Court, however, concluded the search was unreasonable because an arrest warrant "carries with it the limited authority to enter a dwelling in which the suspect lives when there is a reason to believe the subject is within" and the evidence in the case suggested otherwise. *Id.* at 214 n. 7. Accordingly, the *Lovelock* court explained that its facts differed from *Steagald* in that the evidence in *Lovelock* did suggest that the suspect lived and was within the residence at the time of the execution of the warrant. 170 F.3d at 344.

Likewise, the facts of this case are also distinguishable from *Steagald*, as Ramos's investigation provided him with a concrete reason to believe Jose resided and was within the St. Michael address; the evidence did not support a belief that Jose was a mere guest at Juan's residence. Accordingly, Juan's case falls in line with the facts presented in *Route*, as well as our sister circuits' decisions in *Bervaldi* and *Lovelock*. Thus, we affirm, holding that the district did not clearly err in denying Juan's motion to suppress the evidence discovered at his residence while Ramos was executing a warrant for Jose.

Viewing the evidence in the light most favorable to the Government, Ramos's visit to the St. Michael address was in accordance with the "reasonable belief" standard, as he had received information from Medina, a member of the LPD, that: (1) Jose had been arrested at the St. Michael address and had given the address as his place of residence in May 2003; (2) he had also given the same address as his place of residence to a bail bondsman; and (3) cars known to be driven by Jose were at the residence. Specifically, consistent with *Route* and *Bervaldi*, Ramos reasonably relied on

14

information that cars known to be driven by Jose were at the St. Michael residence as support for executing the warrant there. Moreover, as the Government argued, that both Juan and Mauro vehemently denied that Jose was present within the St. Michael residence likely raised a "red flag" that they were "covering" for their brother and that Jose actually was within the residence.

We recognize the expectation of privacy one enjoys when inside his home; nonetheless, we agree with the district court in this case, holding that Ramos surpassed the threshold requirements for the "reason to believe"standard in executing the arrest warrant for Jose in a timely fashion. The district court did not err in denying the motion to suppress, as Ramos performed due diligence sufficient to support a finding that he reasonably believed that Jose lived at the St. Michael residence and was inside the residence during the execution of the warrant. Accordingly, viewing the evidence in the light most favorable to the Government, we affirm the district court's denial of the motion to suppress.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

15