RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0048p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

No. 11-6433

*v.*

STEVEN SHAW,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:09-cr-20235-1—Jon Phipps McCalla, Chief District Judge.

Argued: October 12, 2012

Decided and Filed: February 21, 2013

Before: SUTTON and GRIFFIN, Circuit Judges; WELLS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Randolph W. Alden, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant. Kevin G. Ritz, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee. **ON BRIEF:** Randolph W. Alden, Stephen B. Shankman, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant. S. Keenan Carter, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

SUTTON, J., delivered the opinion of the court, in which WELLS, D. J., joined. GRIFFIN, J. (pp. 8-15), delivered a separate dissenting opinion.

_____

[*]The Honorable Lesley Wells, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

1

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.   Officer Harold Cheirs and his partner, Officer Robinson, tried to serve an arrest warrant on Phyllis Brown at 3171 Hendricks Avenue in Memphis, Tennessee.  When they got to Hendricks Avenue, they could not find a house with a 3171 address.  They eventually found two houses on opposite sides of the street with a 3170 address, at which point, you might say, they were getting warmer. One of the houses presumably was mislabeled, and the officers had several options at their fingertips to figure out which house was 3171 Hendricks and which was not.  They could have determined which side of the street contained odd-numbered addresses and served the warrant on the "3170" address on that side of the street.  They could have checked city records or for that matter Google Maps to identify which house was the right one.  Or they could have gone up to one of the houses and asked an occupant which house was 3171 Hendricks and which one was 3170 Hendricks.

The officers picked the last option—in part.  Noticing that one of the two houses was occupied, they proceeded to that one.  Now they were getting colder.  Officer Cheirs knocked, a woman answered, and she promptly shut the door.  While Officer Robinson went to the back of the house, Officer Cheirs knocked again.  The occupant eventually opened the door, though not for seven or eight minutes.  Instead of asking the woman what the address of the house was, whether Phyllis Brown lived there or whether this was the odd-numbered side of the street, Officer Cheirs represented to the woman that he had a warrant "for this address."  False.  He had a warrant for 3171 Hendricks, and this was 3170 Hendricks.

Having no reason to know that this representation was false and opting not to insist on looking at the warrant, the woman let the officers into the house—the house of Phyllis Brown's hapless neighbor, Steven Shaw.  The officers performed a protective sweep of the house.  Instead of finding Brown, they found a lot of cocaine.  They arrested Shaw, and a grand jury charged him with a battery of drug-dealing and drug-

possession offenses.  The district court denied Shaw's motion to suppress the drugs found at his house.  He pled guilty to distributing cocaine, *see* 21 U.S.C. § 841(a)(1), all the while reserving the right to appeal the suppression ruling.  The district court sentenced him to 126 months in prison.

Shaw's appeal raises two Fourth Amendment questions:  Did the officers permissibly enter the house?  And did they permissibly stay there long enough to see the cocaine?

As to the first question, what made the officers think this was 3171 Hendricks?  And was that thinking reasonable?  Was it reasonable to tell the occupant they had an arrest warrant "for this house" when that statement had at least a fifty-fifty likelihood of being false and when readily available alternatives could have confirmed where 3171 Hendricks was?  The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  That means, among treatises full of other requirements, that officers must "take steps to reasonably ensure" they are not entering the wrong home when they execute an arrest warrant. *El Bey v. Roop*, 530 F.3d 407, 416 (6th Cir. 2008); *see Steagald v. United States*, 451 U.S. 204, 216 (1981); *Payton v. New York*, 445 U.S. 573, 603 (1980); *United States v. Pruitt*, 458 F.3d 477, 480 (6th Cir. 2006).

The officers offer five potential reasons for entering Shaw's house to serve this arrest warrant, and none is reasonable—singly or cumulatively.  Reason one:  this house was occupied, and the other was not.  But the occupation of a house at a given point in the day says nothing about its address or whether the object of an arrest warrant lives there.  It is quite possible, indeed, that the opposite is true—that fugitives generally do not spend a lot of time at home.

Reason two:  a woman answered the door, and Phyllis Brown is a woman.  Yet there were many people in the house, and the reality that one of them was a woman proves nothing.  Of course, if the officers had looked at a picture of Phyllis Brown before serving this warrant, that could have confirmed or, as here, alleviated their suspicions when they met someone other than Phyllis Brown.  As with other obvious

options in this case—checking for the odd-numbered side of the street, checking city records, checking Google Maps—the apparent choice not to learn what Phyllis Brown looked like before serving this arrest warrant amounts to one more self-imposed shroud of ignorance that made other potential clues look more salient than they were.

Reason three: the woman closed the door upon first seeing them. Perhaps the officers could think that this reaction showed the woman was up to no good, but it does not make her Phyllis Brown (particularly when the same woman returned to the door), it does not make the house 3171 Hendricks, and it does not by itself justify entry into the house. That is all the more so here. The officers had an arrest warrant for criminal trespassing, not drug dealing or something else that an occupant might wish to hide from the officer's view. The most law-abiding place for criminal trespassers to be is at home, on *their* property. The only people apparently trespassing that day were the officers.

Reason four: the officers saw scales in the house. Ditto. This might be helpful if the officers could connect this observation to Phyllis Brown and the reason for her arrest. Yet this criminal-trespassing arrest warrant had nothing to do with drug dealing, and the officers do not claim that the observation of the scale gave them exigent circumstances to enter the house.

Reason five: the officers had a fifty-fifty chance of being right, and that alone allowed them to take this approach. Yes, yes, and no. Yes, the officers had even odds of being right—at least as long as they refused to determine which side of the street contained odd-numbered houses. Yes, there was nothing wrong with going up to the house. But, no, officers may not say something is true —that they have an arrest warrant "for this house"—as a basis for obtaining entry into the house when there is a fifty-fifty probability that the statement is false. That is all the more true when there are readily available means for alleviating most, if not all, doubt about the point, and when no officer-safety concerns justify the deception. *See United States v. Hardin*, 539 F.3d 404, 425 n.12 (6th Cir. 2008).

Law-enforcement work is not easy, and no one doubts the correlation between preserving public safety and preserving a free society. Nor does anyone doubt the

imperative of allowing officers to use ruses and lies in the course of this essential work, particularly if the tools of indirection ensure police safety. Think of an undercover officer asked what he does for a living. But none of this permits officers to tell an occupant that they have a warrant to make an arrest at a given address when they do not. The officers took a knowing roll of the dice, and perhaps it would have worked had they been right as a matter of chance about the address. But when they were wrong, that was their problem, leaving them with having obtained entry into the wrong house based on a false pretense. An officer may not falsely tell a homeowner that he has an arrest warrant for a house, then use that falsity as the basis for obtaining entry into the house.

The Supreme Court has said as much. Forty-five years ago, it faced this question: whether "a search can be justified as lawful on the basis of consent when that 'consent' has been given only after the official conducting the search has asserted that he possesses a warrant" when he does not? The answer was no. *Bumper v. North Carolina*, 391 U.S. 543, 546–51 (1968); *see also United States v. Escobar*, 389 F.3d 781, 786 (8th Cir. 2004) (holding that officers may not obtain consent to search through a "false claim of legal authority"). The equivalent is true here.

Is there any doubt, moreover, that the woman at the door would have denied entry had the officers told her the truth—that they had an arrest warrant for the address across the street? That is the relevance of the door-closing episode, not that it somehow showed this was 3171 Hendricks.

This is not the only problem with the encounter. Just as the officers entered the house based on a hollow representation, they overstayed their stay based on one. After the officers falsely said they had a warrant for this address, the woman trustingly let them in. The officers saw five people in the front room, and one officer asked who lived there and who owned the property. The still-unidentified woman at the front door said she lived there, and so did one of the men. One of the occupants then asked, "[W]hat address y'all looking for?" R.52 at 36. An officer responded, "3170 Hendricks." False again. The apparent justification for this answer was the risk that, if the officers told them the truth—they had an arrest warrant for 3171 Hendricks—the occupants would

"lie" and say that *this* was 3170 Hendricks. The officers were right about one thing—the proclivity for lying that day—as the occupants answered, falsely, that "this is 3171 Hendricks." Seizing on the answer, the officers claim that it gave them a definitive right to stay in the house. But the officers misjudged the impact of a false response to a false statement, what you might say was being too deceptive by half. The two falsities still left the officers with a false premise—that this was 3171 Hendricks. It was not.

What a tangled web, one not even justified by the pull of expedience. Had it not occurred to anyone to ask, straightforwardly, which house is 3171 Hendricks and which house is 3170 Hendricks? That question would leave no one, truthful and deceptive alike, any room to maneuver.

But that is not the key problem. No custom of law-enforcement training of which we are aware, and certainly no custom of Fourth Amendment law, allows an officer to give a false answer to the question "What right do you have to be here?" as a basis for staying put. Just as a lie about an address cannot supply the basis for entering a house, it cannot supply the basis for staying in a home once an occupant asks the officers what right they have to be there. Otherwise, an officer, when challenged over his right to enter a house, could say he had an arrest warrant when he did not. Or these officers, when asked to show the arrest warrant, could have produced a false arrest warrant, one with the wrong address. No one plausibly thinks that is permissible. *See Bumper*, 391 U.S. at 549–50. Why was this law-enforcement encounter any different? The government offers no good reason, and we cannot think of one on our own.

The officers, in short and in truth, had no right to enter the house based on a falsity and no right to stay there based on a falsity. That is all there is to it, or at least almost all. One other thing: There may be good candidates for taking a stand on the exclusionary rule, but this is not one of them. The government urges us not to exclude this evidence even if the officers violated the Fourth Amendment in obtaining it. *Herring v. United States*, 555 U.S. 135 (2009), it is true, recognized that the exclusionary rule often is over-inclusive, requiring courts to suppress evidence even when officers have obtained it in good faith and even when suppression does not further the central

premise of the rule:  deterrence.  *Id.* at 141.  But so long as there is an exclusionary rule, it seems safe to say that it will apply to officers who enter and remain in a house based on false pretenses—one step removed from the "isolated negligence" at issue in *Herring* and another step removed from the "attenuated" link between the officer misconduct in *Herring* and the arrest there.  *Id.* at 137.  Shaw's case is not Herring's case.

We reverse the district court's contrary Fourth Amendment decision and remand the case for further proceedings.

————————————

**DISSENT**

————————————

GRIFFIN, J., dissenting.

I respectfully dissent.  Because the district court did not clearly err in its fact finding and correctly applied the law, I would affirm its denial of defendant Shaw's motion to suppress the cocaine evidence.  In addition, I would affirm defendant's within-Guidelines sentence.

I.

"When reviewing the denial of a motion to suppress, this [c]ourt reviews a 'district court's findings of fact for clear error and its conclusions of law *de novo*,' considering the evidence 'in the light most likely to support the district court's decision.'" *United States v. Pruitt*, 458 F.3d 477, 480 (6th Cir. 2006) (quoting *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000)).  A factual finding is clearly erroneous when, "'although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Navarro–Camacho*, 186 F.3d 701, 705 (6th Cir.1999)).

The findings of facts that we must accept, unless clearly erroneous, are set forth in the district court's order adopting the report and recommendation of the magistrate made following an evidentiary hearing.  The factual findings of particular significance are as follows:

> On October 28, 2008, the Shelby County Sheriff's Department assigned Officer Harold Cheirs ("Officer Cheirs") to serve a valid arrest warrant on Phyllis Brown ("Brown") at 3171 Hendricks Avenue.  Upon arriving at the location, Officer Cheirs and Officer Robinson found two homes with an address of 3170 Hendricks, and no home with an address of 3171 Hendricks.  Among the two houses, the officers chose to approach the house with signs of activity, an open front door, and several cars parked in front.  Officer Cheirs testified that he would first attempt to "make

contact" with the inhabitants and then investigate outside the home if unable to do so.

Officer Cheirs, dressed in his police uniform, proceeded to the back of the house and knocked on the door. Stephanie Harris ("Harris") opened the door and slammed it in his face. *Officer Cheirs believed, however, that the black female who slammed the door in his face was Phyllis Brown, the subject of the arrest warrant*.[1]  He alerted Officer Robinson of what occurred and knocked again. Harris did not open the back door of the house until seven or eight minutes had passed.  In the meantime, Officer Cheirs observed "a couple people in the living room, people in the kitchen area and stuff on . . . scales on the table."

Officer Cheirs testified that he did not go in the house at this moment for safety reasons, but was "kind of half and half" in the doorway so that "[t]hey couldn't close the door on [him]."  He announced that "we got a warrant for this address" and asked "who all lives here" and "who's the owner?" Harris identified herself as a resident, but none of the occupants clarified who owned the house.  When Harris asked what address Officer Cheirs was looking for, he replied 3170 Hendricks, instead of the 3171 Hendricks address on the warrant.  Officer Cheirs testified that he did so because in his experience people often lie "when you are looking for a particular address," and he sought to elicit the address of the premises. Harris told him that the address was 3171 Hendricks, and "then everybody else said 3171."  In light of this comment and the suspicious activity he observed, Officer Cheirs "believed that it was the correct address at that time."

---

[1]*Officer Cheirs testified that he could not recall whether he had seen a photo of Brown*, whether he "pulled her booking photo," whether any photo was attached to the arrest warrant, or whether he did any further search to obtain a photo.

---

(Internal record citations omitted; emphasis added.)

After its review of the evidence presented at the evidentiary hearing, the district court correctly followed the authority of *Payton v. New York*, 445 U.S. 573 (1980), in ruling that Shaw's Fourth Amendment rights were not violated by the subsequent discovery of the cocaine during the entry into the residence in execution of the arrest

warrant.  In *Payton*, the Supreme Court held that, "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."  *Id.* at 603.  In *Pruitt*, we expressly applied a "reasonable belief" standard for the entry of a dwelling pursuant to an arrest warrant.  *Pruitt*, 458 F.3d at 485.  In doing so, we rejected the approach utilized by the Ninth Circuit which equated "reasonable belief" with "probable cause."  *Id.* at 483; *see United States v. Gorman*, 314 F.3d 1105, 1111 (9th Cir. 2002).  Although in dicta the panel majority in *United States v. Hardin* questioned the binding effect of *Pruitt*'s interpretation of *Payton*, 539 F.3d 404, 416 n.6 (6th Cir. 2008), *Pruitt* remains controlling:  "we hold that an arrest warrant is sufficient to enter a residence if the officers, by looking at common sense factors and evaluating the totality of the circumstances, establish a reasonable belief that the subject of the arrest warrant is within the residence at that time."  *Pruitt*, 458 F.3d at 483.

As *Pruitt* made clear, the "reasonable belief" standard is different and less demanding than the "probable cause" standard.  *Id*. at 484.  While "probable cause" is a "fair probability," *Illinois v. Gates*, 462 U.S. 213, 238 (1983), "reasonable belief" is an actual belief, rationally drawn through a common sense evaluation of the circumstances presented.  *See Pruitt*, 458 F.3d at 483.  Thus, the "fair probability" standard of probable cause as defined by *Gates* does not apply in this case.

Here, the district court found, as a matter of fact, that when the African-American woman slammed the door in his face, Officer Cheirs believed that he had found the subject of the arrest warrant, Phyllis Brown.  Although it was subsequently shown that Officer Cheirs was mistaken, his belief was actual and based on a rational assessment of the circumstances.  Because two houses had the address of 3170 Hendricks, and therefore one of them must have been 3171 Hendricks (the believed residence of arrest warrant subject Brown), the officers had a fifty-percent chance of knocking on the right house.  While fifty percent may not pass the "probable cause" standard, it certainly passes the "reasonable belief" standard, particularly in view of the ongoing activity within the home.

Most importantly, the police were not executing a search warrant on a particular residence. Rather, they were executing an arrest warrant for a person: Phyllis Brown, whose last known address was 3171 Hendricks. Brown had previously evaded the authorities by failing to appear at a state court proceeding on a underlying charge of criminal trespass. In the present case, the black woman who answered the door of 3170 Hendricks slammed it in the face of the uniformed police officer. At the evidentiary hearing, Officer Cheirs testified that the woman's defiance reinforced his belief that he had found Brown, explaining that "when people do something like that, I mean like close the door on me, I'm thinking that, well, we got one fixing to run or something, fixing to hide." In this regard, Officer Cheirs reasonably concluded that the woman's evasion to him as a uniformed police officer was consistent with someone who was the subject of an arrest warrant issued for failing to appear on a criminal trespass charge. Pursuant to *Payton* and *Pruitt*, no Fourth Amendment violation was committed because Officer Cheirs's belief was rationally drawn from a common sense evaluation of the circumstances.

The majority avoids this conclusion by holding that the officers acted without reason in executing the arrest warrant. I disagree. With the benefit of hindsight, the majority notes many investigative checks the police "could" have performed to confirm with certainty that the person whom the police thought was Phyllis Brown, was in fact her. However, the determination of reasonable belief is based on real-world circumstances, not hypotheticals. *See United States v. Bervaldi*, 226 F.3d 1256, 1266 (11th Cir. 2000). Caution must be exercised before second-guessing what police officers could or should have done. *See, e.g., United States v. Lovelock*, 170 F.3d 339, 344 (2d Cir. 1999) ("[T]he constitutional requirement is that [police officers] have a basis for a reasonable belief as to the operative facts, not that they acquire all available information or that those facts exist[.]"); *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001).

My colleagues raise the bar by creating an impossible and unique standard for the Fourth Amendment: because the officers got it wrong and "could have" done more to get it right, the Fourth Amendment is violated and the exclusionary rule applies. This

absolutist approach is naive and contrary to the Constitution. If accepted by our circuit, it will devastate practical law enforcement.

The majority also questions the lawfulness of the ruse engaged by Officer Cheirs in responding with the wrong address when asked for what address he was looking. The only authority cited by the majority are inapplicable cases dealing with improperly obtained consents to search. However, this is not a case adjudicating a subject's consent to search. Instead, it involves the standard governing the entry of a dwelling pursuant to a valid arrest warrant. *See United States v. Alejandro*, 368 F.3d 130, 137–38 (2d Cir. 2004) ("There is no constitutional mandate forbidding the use of deception in executing a valid arrest warrant." (internal quotation marks and citation omitted)); *United States v. Michaud*, 268 F.3d 728, 731, 733 (9th Cir. 2001) (defendant's objection to police officers' use of deception during the execution of an arrest warrant described as "unavailing" given the existence of a valid arrest warrant). The issue of consent is simply not relevant because the Fourth Amendment allows officers to enter private residences without consent to execute an arrest warrant, provided the officers had a reasonable belief that the target of that warrant lived at the residence entered and was present at that time. *El Bey v. Roop*, 530 F.3d 407, 416 (6th Cir. 2008). That is the case here.

## II.

Next, the district court correctly held in the alternative that, even if the officers had conducted an improper search, the drugs discovered during that search "would not be subject to suppression because of the officers' good faith reliance on their mistaken identification of Harris as their suspect." The district court explained:

> The exclusionary rule is intended to "deter deliberate, reckless, or grossly negligent conduct." *Herring v. United States*, 129 S. Ct. 695, 702 (2009) (holding that the exclusionary rule does not apply to seized evidence during a search incident to arrest where the officers mistakenly believed the defendant had an outstanding search warrant). Here, suppression would serve no great deterrent effect where Officers Cheirs and Robinson shared the good faith belief that they were at the correct house

and also exercised restraint in searching the house until they obtained a search warrant.

Again, I agree with the ruling of the district court.

The majority conclusorily dismisses the good faith exception to the exclusionary rule. However, assuming, arguendo, that the officers violated Shaw's Fourth Amendment rights, application of the exclusionary rule is not warranted. "[S]uppression is not an automatic consequence of a Fourth Amendment violation." *Herring*, 129 S. Ct. at 698. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 702. The rule serves to deter deliberate, reckless, or grossly negligent conduct, and, in some circumstances, recurring or systemic negligence. *Id.*

Here, the record demonstrates an absence of deliberate, reckless, or grossly negligent conduct. At worst, the officers had a valid arrest warrant and negligently served it on the wrong house. Suppression serves no appreciable deterrent effect given the officers shared a good-faith belief that, based on a totality of the circumstances, they were at 3171 Hendricks Avenue. They also exercised restraint in their protective sweep of the residence until they obtained a search warrant. Moreover, they halted their sweep once they learned that they were at the wrong house. Any error on the part of the officers was not premeditated, reckless, or grossly negligent. Nor was their conduct sufficiently culpable to justify the principal cost of applying the exclusionary rule. Accordingly, I conclude that this is not an appropriate case for deterrence and suppression is not warranted.

### III.

Shaw also argues that his sentence is substantively unreasonable. First, he asserts that the district court impermissibly attempted to "make up" for perceived lapses in the state criminal justice system by declining to consider a sixty-month sentence. Shaw claims that because the district court suggested that state court punishments were lax as

compared to the federal system, it harshly sentenced Shaw to "make up the difference." Second, he argues that the district court refused to "even consider" his individual characteristics until the 18 U.S.C. § 3553(a)(2)(C) analysis.

We review a district court's sentencing decision for substantive reasonableness under the abuse-of-discretion standard. *United States v. Jones*, 641 F.3d 706, 711 (6th Cir. 2011). "[A] sentence within a properly calculated Guidelines range is presumed to be reasonable." *United States v. Rosenbaum*, 585 F.3d 259, 267 (6th Cir. 2009). "A sentence is substantively unreasonable if the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Camiscione*, 591 F.3d 823, 832 (6th Cir. 2010) (citation and internal quotation marks omitted).

Shaw has not rebutted the presumption that his within-Guidelines sentence is substantively reasonable. His first argument apparently originates from the parties' discussions with the district court about how the state system punishes defendants less severely than the federal system for similar crimes. Shaw cannot fairly extract from this conversation the proposition that the district court sentenced him within the Guidelines to deliberately "send a message" to the state court system. It does not follow from the district court's apparent disapproval of a state court sentencing regime that a within-Guidelines sentence is substantively unreasonable. Nothing in the record supports Shaw's speculation that the district court "refused to even consider a variance" because it was preoccupied with "making up" for perceived inadequacies in the state system.

Contrary to his second argument, the sentencing transcript reveals that the district court thoroughly reviewed and considered Shaw's individual circumstances. It contains numerous examples of how the court factored Shaw's background and characteristics in the § 3553(a) analysis, not just during the § 3553(a)(2)(C) discussion as Shaw claims. Accordingly, Shaw has failed to rebut the presumption that the district court's within-Guidelines sentence was substantively reasonable.

IV.

For these reasons, I respectfully dissent and would affirm.