Indira BOWEN, et al., Plaintiffs,

v.

COUNTY OF WESTCHESTER, et al., Defendants.

Case No. 07–CV–6277 (KMK).

United States District Court, S.D. New York.

March 31, 2010.

James Michael Lenihan, Esq., Lenihan & Associates, LLC, White Plains, NY, for Plaintiff.

Matthew Ian Gallagher, Esq., Westchester County Attorney's Office, White Plains, NY, Chad Lee Klasna, Esq., Callahan & Fusco, LLC, East Hanover, NJ, for Defendant.

### OPINION AND ORDER

KENNETH M. KARAS, District Judge:

Plaintiff Indira Bowen, and her children, Plaintiffs Mia Bowen and Raylyn Fairclough (collectively, "Plaintiffs"), bring this action alleging violation of their Fourth Amendment rights, pursuant to 42 U.S.C. § 1983, as well as the New York Constitution, and the commission of common law torts. As defendants, Plaintiffs name the County of Westchester, the Town of Greenburgh, and John Does 1–10 (collectively, "Defendants"). The Doe Defendants are employees of the two named Defendants. The County of Westchester and the Town of Greenburgh have each moved for summary judgment.[1] For the forgoing reasons, both motions are granted.

### I. Background

#### A. Facts

This suit arises from a search of Plaintiffs' home conducted by police officers employed by the Town of Greenburgh and officers of the Westchester County Department of Probation ("WCDP") on October 7, 2004. (Def. Greenburgh's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Greenburgh 56.1") ¶¶ 20–37; Def. Westchester's Rule 56.1 Statement ("Westchester 56.1") ¶ 46.)[2] The Greenburgh officers were executing a search order obtained by WCDP officers. (Westchester 56.1 ¶¶ 29–30.) The target of the search was Roylin

---

1. The Court is not considering, because it has not been asked to consider, whether Plaintiffs have any viable claims against the Doe Defendants.

2. While Westchester County employees were also involved in the search, they did not enter the apartment until after the Greenburgh officers secured the premises. (Westchester 56.1 ¶ 47.) Accordingly, Plaintiffs' excessive force claims appear to be directed only at the Greenburgh officers.

Fairclough, the father of Plaintiff Raylyn Fairclough. (*Id.* ¶¶ 22, 39.) The search order was issued for Plaintiffs' apartment at 5 Maple Street (and another residence believed to be used by Roylin Fairclough's mother) based on the affidavit of Westchester Probation Officer Lorin Stapleton ("PO Stapleton"), which asserted his belief that Mr. Fairclough resided both at that address with Plaintiffs and at another address with his mother. (*Id.* ¶ 28.) Plaintiffs contend that PO Stapleton had no basis to assert that Mr. Fairclough resided (even on a part-time basis) with Plaintiffs. (Pls' Statement in Accordance with Local Rule 56.1 and in Resp. and Opp. to Def. Westchester County's Mot. for Summ. J. ("Pls.' 56.1 in Resp. to Westchester") ¶ 28.)

PO Stapleton believed that Mr. Fairclough resided with Plaintiffs based on the following undisputed facts. On September 8, 2004, Detective Kenneth Schaeffer, a Westchester Police Officer and a member of an FBI Violent Crimes Task Force, contacted PO Stapleton concerning Mr. Fairclough, a WCDP probationer. (Westchester 56.1 ¶ 20.) The FBI Task Force suspected that Mr. Fairclough was a member of a twenty-six person conspiracy to traffic narcotics and firearms, and had evidence that he had sold a nine millimeter pistol to an undercover officer. (*Id.* ¶ 23(a).) In fact, PO Stapleton was informed that Roylin Fairclough had been named in a sealed indictment in federal court. (*Id.*) At the time that PO Stapleton learned all of this, Roylin Fairclough was serving five years' probation for being convicted of Attempted Criminal Possession of a Controlled Substance in New York State Supreme Court for Westchester County. (*Id.* ¶ 21(a).) The Pre–Sentence report submitted in that case described Roylin Fairclough as a "young man with an extensive history of highly violent acts." (*Id.*) PO Stapleton was aware that Fairclough lived at 123 Tarryhill Way in White Plains,

New York (*id.* ¶ 21(a)), and that Fairclough's daughter, Plaintiff Raylyn Fairclough, and her mother, Plaintiff Indira Bowen, resided at 5 Maple Street, located within 100 yards of 123 Tarryhill Way. (*Id.* ¶ 21(c)-(d).)

WCDP files indicated that Roylin Fairclough had an ongoing relationship with his daughter and Ms. Bowen (*id.* ¶ 22), although the Parties now dispute "the degree of the relationship." (Pls.' 56.1 in Resp. to Westchester ¶ 22.) In particular, the WCDP files that PO Stapleton indisputably reviewed indicated that Plaintiff Bowen was referred to as Roylin Fairclough's "girlfriend," that Roylin Fairclough had claimed to have provided support to his and Bowen's child, Raylin, "on [his] own," and not due to any court orders, and that Roylin Fairclough had excused himself from court-ordered treatment "to watch his child." (Westchester 56.1 ¶ 21(c)-(e).) Based on this information, PO Stapleton believed that Roylin Fairclough had an "ongoing relationship" with Bowen and Raylin Fairclough.

Detective Kenneth Schaeffer also informed PO Stapleton that the FBI Task Force had a police source who indicated that Mr. Fairclough was also residing at 5 Maple Street, with his daughter and her mother. (Westchester 56.1 ¶ 23(d).) Although Plaintiffs claim this information was false, they do not dispute that the source provided the information to the FBI Task Force, or that Detective Schaeffer relayed it to PO Stapleton. (Pls.' 56.1 in Resp. to Westchester ¶ 23(d).). Based on the information summarized above, PO Stapleton and his superior, Assistant Commissioner James O'Shea, decided to seek a court order to search both of Mr. Fairclough's reported residences, 123 Tarryhill Way and 5 Maple Street. (Westchester 56.1 ¶ 25.) It was important that the order authorize searches of both Mr. Fairc-

lough's believed residences because the FBI Task Force, having obtained a sealed indictment of Mr. Fairclough and others, hoped to arrest each of the twenty-six co-conspirators at the same time. (*Id.* ¶ 23(c).) [3]

PO Stapleton drafted an affidavit for a search order based on the above information, and submitted it to Assistant Commissioner O'Shea and Deputy Commissioner Jacolyn Levin, who reviewed it for form and legal sufficiency. (*Id.* ¶¶ 26–30.) Specifically, PO Stapleton noted Mr. Fairclough's prior conviction (Gallagher Decl. Ex. E ¶ 4), his probation (*id.* ¶¶ 4–5), the FBI Task Force's investigation of the gang with whom Mr. Fairclough was allegedly involved (*id.* ¶ 7), and Mr. Fairclough's alleged sale of a handgun to an undercover officer (*id.*). PO Stapleton further stated that Mr. Fairclough "currently maintains two addresses as per field observations conducted by members of the Westchester County Department of Public Safety/FBI Violent Crime Task Force as well as based upon statements made by [Fairclough] to Probation Officer Sandra Molinari." (*Id.* ¶ 9.) [4] PO Stapleton stated that those addresses were 123 Tarryhill Way and 5 Maple St. (*Id.*) The affidavit indicated that "all of the information [it] contained" was "based either upon [PO Stapleton's] knowledge as gained through the records and files of [WCDP] as well as [sic] upon information obtained from the Westchester County Department of Public Safety." (*Id.* ¶ 3.)

PO Stapleton's affidavit was also reviewed by Detective Schaeffer and Assistant County Attorney Richard Harris. (*Id.* ¶¶ 33–36.) PO Stapleton and Assistant County Attorney Harris then submitted the search order application to Judge Robert DiBella who questioned PO Stapleton. After PO Stapleton spoke with Detective Shaeffer to confirm certain information, Judge DiBella signed the Order. (*Id.* ¶¶ 37–39.)

Defendant Westchester has provided the Court its standing policy on search orders, and documented the training that each probation officer must receive regarding that policy. (*Id.* ¶¶ 1–11.) Plaintiffs do not dispute that this policy was in effect or that probation officers were trained to follow it. Instead, Plaintiffs claim that "the WCDP personnel involved in the process [did not] actually follow[ ] the written polices and procedures promulgated by the WCDP at the time PO Stapleton sought his Search Order." (Pls.' 56.1 in Resp. to Westchester ¶ 9.) Defendant Westchester also has provided the Court with a summary of the extensive training and experience that PO Stapleton had received in the course of his nineteen-year career. (*Id.* ¶ 18.) Outside of this case, Plaintiffs do not point to a single blemish on PO Stapleton's record.

On October 7, 2004, Greenburgh police officers assisted in executing the Search Order, at the request of WCDP. (Greenburgh 56.1 ¶¶ 20–37.) In particular, it was Greenburgh SWAT officers who first entered the premises at 5 Maple Street to conduct a protective sweep. (*Id.* ¶¶ 28, 37.) Plaintiffs allege that the Greenburgh officers used excessive force during this initial sweep. (Am. Compl. ¶¶ 23–30.) Specifically, Plaintiffs contend that an officer took Ms. Bowen into another apart-

---

**3.** There has been no challenge to the federal arrest warrant.

**4.** This paragraph notes, additionally, that "[r]ecords maintained by the Westchester County Department of Correction, the Westchester County Department of Probation, po-lice records, and telephone records also show that [Fairclough] maintains the below-listed addresses at 123 Tarryhill Way, White Plains, New York. He is also known to currently reside at 5 Maple Street." (Gallagher Decl. Ex. E ¶ 9.)

ment and ignited a flash-band grenade in order to intimidate her. (*Id.* ¶ 25.)[5] Plaintiffs further assert that Ms. Bowen was frisked by male officers, ordered to lie down, and then forced to leave the apartment, all while clothed only in a bathrobe. (*Id.* ¶ 26.) The Amended Complaint avers that these alleged actions were the result of the Town of Greenburgh's "failure properly to train and supervise its personnel." (*Id.* ¶ 32.)

### B. Procedural History

Plaintiffs filed their initial Complaint on July 9, 2007 (Dkt. No. 1), and amended it on April 11, 2008. (Dkt. No. 15.) The Amended Complaint contains eight causes of action. The first is a claim that Defendants Westchester and Greenburgh violated Plaintiffs' Fourth Amendment rights, based on (i) a "pattern and practice" of submitting false information in support of search warrants (as to Westchester only), (ii) a failure to train their officers notwithstanding knowledge that their officers would have to provide accurate information in support of search warrants, and (iii) deliberate indifference to the accuracy of information provided in search warrant applications. (Am. Compl. ¶¶ 33–37.) The second cause of action alleges a violation of the Fourth Amendment right to be free from unreasonable searches and seizures. This claim identifies only the Doe Defendants, and asserts that Plaintiffs should be free from searches and/or seizures unsupported by probable cause. (*Id.* ¶ 39.) The third cause of action asserts a violation of the New York Constitution's prohibition of unreasonable searches and seizures, and again names only the Doe Defendants. (*Id.* ¶ 42.) The fourth, sixth and seventh causes of action allege common law torts of false imprisonment, assault, and battery,

respectively. (*Id.* ¶¶ 44–46, 50–55.) No defendants are identified in these claims. The fifth cause of action alleges that the Doe Defendants used excessive force during the search, in violation of the Fourth Amendment. (*Id.* ¶¶ 47–49.) Westchester and Greenburgh are not named as defendants in this cause of action. Finally, the eighth cause of action alleges common law negligence against only Westchester, based on its supposed failure to train its officers. (*Id.* ¶¶ 56–60.) To date, the Amended Complaint has not been further amended to identify the individual John Doe Defendants.

The case was assigned for all purposes to Magistrate Judge Lisa Smith on July 11, 2007, pursuant to the standing order of Chief Judge Kimba M. Wood. (Dkt. No. 2.) On July 31, 2009, Westchester and Greenburgh separately moved for summary judgment. (Dkt. No. 23–24.) Plaintiffs did not respond to these motions until February 5, 2010. (Dkt. Nos. 42–47.) Magistrate Judge Smith sanctioned Plaintiffs' counsel $400 for the delay. (Dkt. No. 48.) The case was reassigned to this Court on March 15, 2010. (Unnumbered Docket Entry between Dkt. Nos. 49 and 50.) Defendants replied on March 22, 2010. (Dkt. No. 53.)

### II. Discussion

### A. Standard of Review

Summary judgment may be granted where it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When ruling on a summary judgment motion, the district court must construe the

---

5. At her deposition, however, Ms. Bowen testified that, in fact, no flash bang grenades were thrown when she was moved to that other apartment. (Reply Decl. in Supp. of Mot. for Summ. J. Ex. A, at 27.) Nonetheless, the Court is willing to assume, for purposes of this motion, that the allegation is true.

facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir.2003); *see also Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir.2006) (noting that a court must draw all reasonable inferences in the nonmovant's favor).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir.2005). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir.2008) (internal citations omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). A fact is material when "it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir.2007) (internal quotation marks omitted). At summary judgment, a court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735

F.Supp. 1205, 1212 (S.D.N.Y.1990). A court's goal should be to "isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548.

## B. Analysis

As described above, most of Plaintiffs' claims are brought against the as-yet-unidentified John Doe Defendants. Thus, the only claims at issue in these motions are those against the public entities of Westchester and Greenburgh, which are alleged to be responsible for violating Plaintiffs' Fourth Amendment rights (and the New York Constitution's equivalent provision) and, in the case of Westchester, of committing the state tort of negligence. In particular, the heart of Plaintiffs' claim is that Westchester and Greenburgh are culpable because allegedly inaccurate information about the possible residence of Roylin Fairclough was presented to the judge who authorized the search order, and that, as a result, an illegal search of Plaintiffs' residence was conducted.

 "Congress did not intend municipalities to be held liable," under 42 U.S.C. § 1983, "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, to "prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir.2008), *cert. denied* —— U.S. ——, 130 S.Ct. 95, 175 L.Ed.2d 234 (2009). The fifth element reflects the principle that "a municipality may not be held liable under § 1983 solely because it employs a

tortfeasor." *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *see also Newton v. City of New York,* 566 F.Supp.2d 256, 270 (S.D.N.Y.2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of *respondeat superior.*" *Pembaur v. City of Cincinnati,* 475 U.S. 469, 478, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *see also Vassallo v. Lando,* 591 F.Supp.2d 172, 201 (E.D.N.Y.2008) ("[A] municipal entity may only be held liable where the entity *itself* commits a wrong. . . .").

 Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 122, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) ("[G]overnmental bodies can act only through natural persons, . . . [and] governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."). Moreover, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government]." *Newton,* 566 F.Supp.2d at 271; *see also City of Oklahoma City v. Tuttle,* 471 U.S. 808, 841, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle,* 200 F.Supp.2d 411, 427 (S.D.N.Y.2002) (same). In the end, therefore, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Roe,* 542 F.3d at 37 (quoting *Brown,* 520 U.S. at 404, 117 S.Ct. 1382).

 "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Davis v. City of New York,* 228 F.Supp.2d 327, 336 (S.D.N.Y.2002), *aff'd,* 75 Fed.Appx. 827 (2d Cir.2003). Both municipal policies and customs can be grounds for *Monell* liability. "The Supreme Court has identified at least two situations that constitute a municipal policy: (1) where there is an officially promulgated policy as that term is generally understood (*i.e.,* a formal act by the municipality's governing body), and (2) where a single act is taken by a municipal employee who, as a matter of State law, has final policymaking authority in the area in which the action was taken." *Newton,* 566 F.Supp.2d at 271 (citing *Monell,* 436 U.S. at 690, 98 S.Ct. 2018, and *Pembaur,* 475 U.S. at 480–81, 106 S.Ct. 1292). "A municipal 'custom,' on the other hand, need not receive formal approval by the appropriate decisionmaker. . . ." *Id.* Instead, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Brown,* 520 U.S. at 404, 117 S.Ct. 1382; *see also Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir.1996) (noting that a municipality's custom "need not be memorialized in a specific rule or regulation"). To prevail on this theory of municipal liability, however, a plaintiff must prove that the custom at issue is well-settled. *See Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915 (noting that the Supreme Court "has long recognized that a plaintiff may be able to

prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law' " (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970))).

### 1. Claims Against the County of Westchester

Plaintiffs' conclusory Amended Complaint and meandering Memorandum of Law seem to assert that Westchester is culpable because (1) its probation officer (PO Stapleton) knowingly provided inaccurate information to the judge who issued the Search Order, and (2) it has failed to train its probation officers, knowing to a "moral certainty" that they have to "determine the residence of suspects sought by way of arrest and/or search warrants," and that they have a "history" of "mishandling such situations." (Am. Compl. ¶¶ 34–35.) Because of these failings, Plaintiffs assert that Westchester has exhibited deliberate indifference to its probation officers using "incredible" information to obtain search warrants. (*Id.*) If the motion before the Court were one to dismiss for failure to state a claim, under Fed.R.Civ.P. 12(b)(6), these general allegations might suffice to advance this case to the next stage. However, the pending motion is one for summary judgment, thus requiring Plaintiffs to offer some evidence from which a reasonable fact finder could determine that Plaintiffs' claims against Westchester had merit. But, Plaintiffs have tendered no evidence to substantiate their allegations.

To begin, Plaintiffs have not offered sufficient evidence to support a claim that their Fourth Amendment rights were violated by PO Stapleton.[6] This is critical, because Plaintiffs cannot hold Westchester accountable for a constitutional violation under § 1983 unless it demonstrates that Westchester employees deprived them of a federal constitutional or statutory right. *See Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 743–44 (2d Cir.2003); *accord Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under Monell was entirely correct."). Initially, Plaintiffs cannot credibly claim that the issuing judge should not have signed the Search Order given the information that was made available to him in PO Stapleton's supporting affidavit because, based on PO Stapleton's affidavit and PO Stapleton's answers to the judge's questions, there plainly was sufficient cause for the judge to find that there was a reasonable basis to search both 5 Maple Street and 123 Terryhill Way. Thus, the Court finds unpersuasive Plaintiffs' mere suggestion that the information connecting Roylin Fairclough to 5 Maple Street was "devoid of any sufficient facts to permit [the judge] to draw the inferences necessary to find that Roylin Fairclough resided at 5 Maple Street." (Pls.' Mem. in Resp. to Westchester 34.) In fact, PO Stapleton's affidavit did not require the issuing judge to draw any inferences; it explicitly stated that Roylin Fairclough "is known to currently reside at 5 Maple Street." (Gallagher Decl. Ex. E ¶ 9.) And, as discussed above, the basis for this statement was both the information provided by Detective Shaeffer to that effect (which included confidential source information), as well as the information in the WCPD file on Roylin

---

**6.** Again, it is important to note that Plaintiffs' other constitutional claims in their second and fifth causes of action (involving the execution of a warrant without probable cause and the use of excessive force) have only been asserted against the individual John Doe Defendants.

Fairclough. Moreover, even if the issuing judge should have required more information, it was entirely consistent with the Fourth Amendment for PO Stapleton and the officers executing the search order to rely on what, on its face, appeared to be a valid search order. *See United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Falso,* 544 F.3d 110, 128–29 (2d Cir.2008); *United States v. Buck,* 813 F.2d 588, 592 (2d Cir.1987).

 Plaintiffs assert that there was an insufficient evidence to believe that Roylin Fairclough resided at 5 Maple Street (in addition to staying at his mother's residence), and point to the fact that he was not found by law enforcement officials on the morning of the search. Of course, the Constitution does not require searches be successful. *See United States v. Lovelock,* 170 F.3d 339, 343–44 (2d Cir. 1999) (noting that a law enforcement officer's belief that a putative arrestee will be at a certain premises need not be correct, so long as it is reasonably held). Instead, the Constitution only requires searches to be reasonable, which presumptively is the case when executed pursuant to a warrant. *See United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) ("[H]ad the magistrate on the same evidence available to the police made a finding of probable cause, the search under the warrant would have been sustained."); *Yates v. City of New York,* No. 04–CV–9928, 2006 WL 2239430, at *9 (S.D.N.Y. 2006) ("The NYPD's search ... is presumptively reasonable because the officers were operating pursuant to a warrant issued by an independent magistrate."). And, even if the information supporting the Search Order was inaccurate, and, in particular, it could be established that Roylin Fairclough did not live (even on a part-time basis) at 5 Maple Street around October 2004, this would not make out a Fourth Amendment violation, unless Plain-

tiffs could prove that PO Stapleton *knew* that Roylin Fairclough did not live there, or that he was reckless in asserting that he had information that Roylin Fairclough lived there at least on a part-time basis. *See Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (holding that a false statement in a search warrant affidavit does not constitute a Fourth Amendment violation unless it is made "knowingly and intentionally, or with reckless disregard for the truth," and is "necessary to the finding of probable cause"); *United States v. Canfield,* 212 F.3d 713, 717–18 (2d Cir.2000) ("To suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: '(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.' " (quoting *United States v. Salameh,* 152 F.3d 88, 113 (2d Cir.1998))).

 Indeed, it is not a constitutional foul for PO Stapleton to have been even negligent in not doing more to confirm the information provided to him by other law enforcement officials about Roylin Fairclough's residences. *See United States v. Perez,* 247 F.Supp.2d 459, 472–73 (S.D.N.Y.2003) (noting that an "inaccuracy that is the result of negligence or innocent mistake is insufficient" to establish a Fourth Amendment violation). Thus, it is wholly unpersuasive for Plaintiffs to assert merely that PO Stapleton disregarded Westchester County Policy in relying on "outside" law enforcement agencies for his information, or that he should have conferred with PO Susan Molinari about Roylin Fairclough's whereabouts, particularly in light of his concerns about maintaining the confidentiality of the FBI's interest in arresting Roylin Fairclough and the other

twenty-five individuals.[7] The law is clear that law enforcement officers may reasonably rely on information provided to them by other law enforcement officers, *see Ventresca,* 380 U.S. at 122, 85 S.Ct. 741 ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant...."); *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) ("[O]fficers, when making a probable cause determination, are entitled to rely ... on the allegations of fellow police officers."); *United States v. Kwok–Ching Yu,* No. 90–CR–0047, 1991 WL 222093, at *3 (S.D.N.Y. Oct. 18, 1991) ("[T]he hearsay information obtained from the other DEA officers was properly considered by the Magistrate in determining probable cause."), and that they need not acquire all information relevant to the search, *see Lovelock,* 170 F.3d at 344 (noting that the Fourth Amendment does not require law enforcement agents to "acquire all available information" to ascertain the whereabouts of an arrestee); *accord Forest v. Pawtucket Police Dep't,* 377 F.3d 52, 57 (1st Cir.2004) ("[Plaintiff] asserts that the officers should have interviewed the other students in the classroom ... before seeking the arrest warrant. However, the law is clear that once police officers are presented with probable cause ... no further investigation is required at that point."); *Forman v. Richmond Police Dep't* 104 F.3d 950, 962 (7th Cir.1997) ("[O]nce police officers have discovered sufficient facts to establish probable cause [to obtain a search warrant], they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence."). At most, these circumstances might support a claim of negligence against PO Sta-

pleton (who is not named as a defendant), but not a constitutional violation, especially where there is insufficient evidence that PO Stapleton had reason to believe that Detective Shaeffer (or any other law enforcement official) was not being truthful with him.

■ Here, Plaintiffs assert that PO Stapleton was more than negligent, broadly alleging that PO Stapleton knew, or had reason to believe, that the information he provided in support of the Search Order application was inaccurate. But, Plaintiffs have not identified any proof to substantiate this allegation. Rather, for example, Plaintiffs assert that the documentary evidence that supports PO Stapleton's statements, including the WCPD files for Roylin Fairclough, have not been provided to them in discovery. (Pls.' Mem. in Resp. to Westchester 35.) But, Plaintiffs made no application to this Court to compel any such discovery and, in any event, information from the files has been included in the exhibits in support of Westchester's motion. (Gallagher Decl. Exs. C, D.) Plaintiffs also claim that PO Stapleton, in his affidavit in support of the Search Order, falsely represented that Roylin Fairclough told PO Susan Molinari that he resided at 5 Maple Street. (Pls.' Mem. in Resp. to Westchester 36 (citing Gallagher Decl. Ex. E ¶ 9).) However, what PO Stapleton stated in his affidavit was that he believed that Roylin Fairclough resided at the two residences (5 Maple Street and 123 Terryhill Way), and that he based his belief on a multitude of sources, including statements by Roylin Fairclough to PO Molinari, as well as information from Detective Shaeffer's Task Force, WCPD records, and oth-

---

**7.** The confidentiality concerns are not unfounded. The Supreme Court has, in fact, compared the relationship between a probation officer and a probationer to that of a teacher and student in that both involve "an

ongoing supervisory relationship—and one that is not, or at least not entirely, adversarial." *Griffin v. Wisconsin,* 483 U.S. at 868, 879, 107 S.Ct. 3164 (1987).

er sources. But, in listing the various sources suggesting that Roylin Fairclough spent time at two residences, PO Stapleton did not state, or even imply, that *each* of these sources of information established residency at *both* residences. To the contrary, PO Stapleton was clear that it was the totality of the information from all of these sources that led him to believe that Roylin Fairclough spent time living at both 5 Maple Street and 123 Terryhill Way. Thus, Plaintiffs have not established that PO Stapleton violated the Fourth Amendment by intentionally or recklessly misleading the judge in applying for the Search Order.

■ But, even if there were intentional inaccuracies in PO Stapleton's affidavit that amounted to a constitutional violation, Plaintiffs need more to establish Westchester's § 1983 liability under *Monell*. It is true that Plaintiffs generally allege that "Westchester County has a pattern and practice of deliberately presenting false information regarding the residence of suspects ... in order to obtain ... warrants." (Am. Compl. ¶ 33.) But, nowhere in their lengthy response to Westchester's summary judgment motion do Plaintiffs cite (let alone provide an offer of proof of) even one other example of a Westchester Probation Office knowingly presenting false information about a probationer's address (or about any other matter). Not one. Thus, the most that can be said of Plaintiffs' case is that PO Stapleton supplied inaccurate information (and that his supervisors did not discover the inaccuracy of this information) to obtain the Search Order. And, even if it could be assumed that PO Stapleton did this knowingly, the most that could be said for Plaintiffs' case is that it involves one instance of illegal conduct by a non-policymaking employee of the county. Such a single instance of employee misconduct does not state a *Monell* claim. *See Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.1995) ("In order

to establish the liability of a municipality in an action under § 1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must establish that the violation of his constitutional rights resulted from a municipal custom or policy."); *Davis v. County of Nassau*, 355 F.Supp.2d 668, 678 (E.D.N.Y.2005) ("A single incident involving an employee below the policymaking level will generally not suffice to support an inference of a municipal custom or policy, absent factual allegations 'tending to support, at least circumstantially, such an inference.'" (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir.1995))) (citation omitted). Rather, as noted above, in order to establish *Monell* liability, Plaintiffs must causally link the constitutional harm to a Westchester County policy, practice, or custom, which could include the conduct of a policymaker.

Plaintiffs try to shoe horn their meager evidence into *Monell* liability in several ways. First, Plaintiffs recite various written policies adopted by Westchester regarding search orders. These written policies govern everything from protocols on sharing information with outside law enforcement agencies, to defining the proper use of search orders against probationers, to the procedures to be followed in procuring and executing search orders. (Pls.' Mem. in Resp. to Westchester 21.) In fact, Plaintiffs acknowledge that these policies were reviewed and further modified by Commissioner Rocco Pozzi in order to establish additional procedures to better ensure the accuracy of search order applications. (*Id.* at 27–28.) The thrust of Plaintiffs' extensive commentary on these policies is not that they are facially unconstitutional or otherwise inadequate, but that PO Stapleton (and some of his supervisors) did not follow them with regard to the Search Order. For example, Plaintiffs assert that "*[c]ontrary to Commissioner*

*Pozzi's directive,* Assistant Commissioner O'Shea and Deputy Commissioner Levin [sic] sole review of PO Stapleton's search order application for Roylin Fairclough was for form and legal sufficiency." (*Id.* at 17 (emphasis added).)

 Plaintiffs' claims are unpersuasive. As a general matter, a breach of departmental policy does not by itself constitute a constitutional violation. *See Virginia v. Moore,* 553 U.S. 164, 128 S.Ct. 1598, 1605, 170 L.Ed.2d 559 (2008) ("It [is] obvious that the Fourth Amendment's meaning d[oes] not change with local law enforcement practices—even practices set by rule."). The rule is no different for warrantless probation searches, contrary to Plaintiffs' claims. (Pls.' Mem. in Resp. to Greenburgh 13.) It is true that the Supreme Court has upheld a warrantless probation search, in part, "because it was conducted pursuant to a valid regulation governing probationers." *Griffin v. Wisconsin,* 483 U.S. 868, 880, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). But, even in that context, the Supreme Court rejected the claim that any violation of a state regulation amounted to a constitutional violation. *See id.* at 880 n. 8, 107 S.Ct. 3164. The Court explained that the "only regulation upon which we rely for our constitutional decision is that which permits a warrantless search on 'reasonable grounds.'" *Id.* Therefore, the failure to follow other regulations, which were not constitutionally required, was deemed to be "irrelevant." *Id.*

 Thus, the question here is whether the WCPD procedures that Plaintiffs cite, and that Plaintiffs assert were ignored, are constitutionally mandated. For example, Plaintiffs allege that WCDP policy requires the Commissioner of Probation to designate a "Criminal Intelligence Coordinator" who would oversee the department's information-sharing with outside law enforcement agencies, but that the Commissioner failed to do so. (Pls.' Mem.

in Resp. to Westchester 6, 38–39.) But nothing in the Constitution requires that probation departments maintain such a position. Nor has Plaintiff offered anything to show that the failure to employ a Criminal Intelligence Coordinator somehow caused PO Stapleton to make recklessly false statements in his search order affidavit. *See City of Canton,* 489 U.S. at 385, 109 S.Ct. 1197 (requiring a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). Thus, the alleged breach of this Policy does not establish a constitutional violation, let alone one by Westchester.

Second, Plaintiffs allege that WCDP has a policy governing and limiting the disclosure of information to outside law enforcement agencies (Pls.' Mem. in Resp. to Westchester 21), but the County nonetheless has a "pattern and practice" of leaking information regarding ongoing investigations to probationers (*id.* at 22). Plaintiffs offer no evidence, once again, to substantiate this claim. Instead, Plaintiffs note that law enforcement officials never contacted Roylin Fairclough's parol officer, PO Molinari, during the investigation leading to the search order out of fear that PO Molinari might alert Fairclough. (*Id.* at 15, 22, 39.) Plaintiffs' theory thus appears to be that Defendants' custom of leaking information to probationers caused them to fail to consult a valuable resource (i.e., Molinari), which in turn caused them to seek and obtain an erroneous search order.

Whatever might be said about the decision not to consult with PO Molinari, which as discussed above amounts to no constitutional wrong, it is not evidence of any improper leaking of information by WCPD. Indeed, Plaintiffs offer no evidence of any instance, this case included, where WCPD officers improperly (i.e., in violation of WCPD policies) shared information with outside law enforcement agen-

cies. And, again, even if they did, Plaintiffs have offered no legal basis for the Court to find a Fourth Amendment violation from such conduct. In fact, the Second Circuit has held that the law permits cooperation between law enforcement agencies and probations officers, so long as probation officers are lawfully pursuing "probation-related objectives." *United States v. Reyes*, 283 F.3d 446, 464 (2d Cir.2002); *accord United States v. Martin*, 25 F.3d 293, 296 (6th Cir.1994) ("[P]olice officers and probation officers can work together and share information to achieve their objectives."). Here, law enforcement officials had information that Roylin Fairclough had committed a serious crime—the sale of a firearm. To not have shared that information with a probation officer, whose primary mission is to ensure that a probationer commits no further crimes, and for the probation officer not to have acted on such information, would have been irresponsible. *See Reyes*, 283 F.3d at 463 ("A probation officer is responsible for ensuring that a convicted person serving a term of ... [probation] is not violating the conditions of his [probation], which includes verifying whether the [probationer] is dealing in drugs or committing other crimes."). For this reason, the law builds no such obstacles between law enforcement and probation officers. *Cf. id.* at 464–65 (noting that federal probation officers are directed to have frequent contact with law enforcement agencies, which can provide "valuable assistance" in the supervision of a probationer) (citations omitted).

Third, Plaintiffs assert that the search of their home violated WCDP's temporary suspension of the "practice of conducting searches requested by and/or based upon information developed by other Law Enforcement Agencies." (Pls.' Mem. in Resp. to Westchester 7.) But, again, even if Defendants violated this departmental policy, they did not violate the Constitution. Moreover, the Second Circuit has specifi-

cally upheld warrantless probation searches conducted at the request of and in concert with police officers. *See United States v. Newton*, 369 F.3d 659, 667 (2d Cir.2004) (rejecting the claim that a probation officer may not "conduct[ ] a probation search on prior request of and in concert with law enforcement officers"); *Reyes*, 283 F.3d at 462–63 (2d Cir.2002) (rejecting "the so-called 'stalking horse' theory, pursuant to which a probation officer may not use his authority to conduct a warrantless home visit to help law enforcement officers evade the Fourth Amendment's usual warrant and probable cause requirements for police searches and seizures"). If police may work with probation officers to conduct searches of probationer's homes without any judicial pre-approval whatsoever, then surely police may work with probation officers to conduct searches where they first obtain a search order signed by a judge.

 Fourth, Plaintiffs insist that Defendants violated WCDP policy by relying on hearsay information from outside law enforcement agencies in their search order application. (Pls.' Mem. in Resp. to Westchester 28.) This claim is perplexing as it has long been established that law enforcement may rely on hearsay in seeking search warrants. *Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."); 2 Wayne R. LaFave, Search & Seizure § 3.3(c) (4th ed.2004) ("[I]t is established beyond question that hearsay may be used to show probable cause."). While the probative

value of hearsay varies greatly depending on the circumstances, the practice of using such information in search order applications certainly does not show "reckless disregard for the truth." *Franks,* 438 U.S. at 155, 98 S.Ct. 2674. Thus, PO Stapleton cannot be faulted for relying on information obtained by other law enforcement officers. *See Ventresca,* 380 U.S. at 122, 85 S.Ct. 741; *Loria,* 306 F.3d at 1290; *Kwok–Ching Yu,* 1991 WL 222093, at *3.

██ Plaintiffs also contend that WCDP's ineffective review of search order applications amounts to an unconstitutional policy or practice. (Pls.' Mem. in Resp. to Westchester 16–17.) It is undisputed, however, that PO Stapleton's affidavit for the Search Order was reviewed by Assistant County Attorney Harris, Assistant Commissioner O'Shea, and Deputy Commissioner Levin. (Westchester 56.1 ¶¶ 26–30, 33–36.) Plaintiffs interpret WCDP policy to require Stapleton's supervisors to personally verify the factual basis for the search order application, rather than to simply review it for form and legal sufficiency. (Pls.' Mem. in Resp. to Westchester 16.) But, the failure to institute such a burdensome procedure does not constitute a policy of recklessly disregarding the truth, especially where, as here, there is no evidence that either the department or the probation officer has a history of submitting false affidavits. *See City of Canton,* 489 U.S. at 398, 109 S.Ct. 1197 ("[A] failure to supervise gives rise to § 1983 liability ... only in those situations where there is a history of wide-spread abuse. Only then may knowledge be imputed to the supervisory personnel.") (citation and internal quotation marks omitted).

██ Finally, Plaintiffs allege that Westchester failed to properly train its employees to present truthful warrant affidavits. (Pls.' Mem. in Resp. to Westchester 38–43.) (*Id.* ¶¶ 32, 34–36.) "In *City of Canton, Ohio v. Harris,* the Supreme

Court established that a municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129 (2d Cir.2004) (citing *City of Canton,* 489 U.S. at 387–90, 109 S.Ct. 1197). Importantly, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal,* 459 F.3d at 219.

██ To demonstrate deliberate indifference, a plaintiff must establish three facts: (i) that a policymaker knows to a "moral certainty" that the municipality's employees will confront a certain situation; (ii) either that the situation presents the municipal employee with a difficult choice of the type that training or supervision will make less difficult, or that there is a history of municipal employees improperly handling the situation; and (iii) that the wrong choice by the municipal employee will often cause the deprivation of an individual's constitutional rights. *See Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992). In addition to deliberate indifference, a plaintiff ultimately must identify "a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Amnesty Am.,* 361 F.3d at 129 (quoting *City of Canton,* 489 U.S. at 391, 109 S.Ct. 1197). In other words, a plaintiff must demonstrate that the municipal employee's "'shortcomings ... resulted from ... a faulty training program' rather than from negligent implementation of a sound program or other,

unrelated circumstances." *Id.* at 129–30 (quoting *City of Canton,* 489 U.S. at 390–91, 109 S.Ct. 1197). "The elements of an identified training deficiency and a close causal relationship, which together require the plaintiff[ ] to prove that the deprivation occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor, ensure that a failure to train does not collapse into *respondeat superior* liability." *Id.* at 130.

■ Plaintiffs' evidence falls short of establishing that Westchester is constitutionally liable for any failure to train. The alleged wrong here was that PO Stapleton lied to a judge to obtain the Search Order. Yet, Plaintiffs provide no evidence that Westchester is or should be aware that its probation officers routinely lie to judges, and they point to no specific flaws in the basic training which Westchester provides to its probation officers that somehow failed to adequately instruct its officers not to lie under oath to judges. (Westchester 56.1 ¶¶ 1–11.) And, the record is clear that PO Stapleton has been through extensive training, including training in probation practices, fugitive investigations, and laws of searches and seizures. (*Id.* ¶ 18a–n.)[8] Given this undisputed record, Plaintiffs' failure to train claim has no merit. Accordingly, Plaintiffs' § 1983 claims against Westchester fail to raise any triable issues of fact, and therefore must be dismissed.

### 2. Claims Against the Town of Greenburgh

■ Plaintiffs' § 1983 claims against Greenburgh likewise fail to raise triable issues of fact. First, Plaintiffs allege that Greenburgh police officers used excessive force in executing the Search Order. (Am. Compl. ¶¶ 23–30.) In responding to Greenburgh's summary judgment motion, however, Plaintiffs offer no response, legal or otherwise, to Greenburgh's contention that this claim is without merit, thus waiving the claim. *See Singleton v. City of Newburgh,* 1 F.Supp.2d 306, 312 (S.D.N.Y.1998) (deeming claim "abandoned" and granting summary judgment where it was alleged in the complaint but "not raised elsewhere in the record"); *Nat'l Commc'n Ass'n, Inc. v. Am. Tel. & Tel. Co.,* No. 92–CV–1735, 1998 WL 118174, at *28 (S.D.N.Y. March 16, 1998) (deeming claim "abandoned" and granting summary judgment where plaintiff did not address claim in response to defendant's summary judgment motion); *Anti–Monopoly, Inc. v. Hasbro, Inc.,* 958 F.Supp. 895, 907 n. 11 (S.D.N.Y.1997) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue."), *aff'd,* 130 F.3d 1101 (2d Cir. 1997). Most glaringly, Plaintiffs offer no evidence that the excessive force which Greenburgh officers allegedly used against Plaintiffs was the result of a Greenburgh policy or custom. Furthermore, Plaintiffs do not identify any specific deficiencies in Greenburgh's training of its officers, nor

**8.** Plaintiffs note that "[s]pecifically not listed in any of the training courses," which PO Stapleton took, "are programs dealing with the constitutional rights of third parties, more specifically the Fourth Amendment rights of third parties." (Pls.' Mem. in Resp. to Westchester 41.) Even if technically true, it hardly constitutes a valid complaint given that PO Stapleton took four courses in search and seizure techniques and law. Specifically, PO Stapleton took (1) a New York State Division of Criminal Justice Services course in the laws of arrest and Fourth Amendment issues and ethics (Westchester's 56.1 ¶ 18(c)); (2) an FBI instructor development course in the Fourth Amendment, the laws of arrest, and ethics (*id.* ¶ 18(k)); (3) a United States Marshall's fugitive investigator course, which covered Fourth Amendment issues (*id.*); and (4) annual WCDP training in the laws of the use of force, mechanics of arrest, ethics, and probation investigation techniques (*id.* ¶ 18(m).

any other instance in which Greenburgh officers used excessive force against anyone. Thus, Greenburgh is entitled to summary judgment on this claim.

█ Second, Plaintiffs allege a constitutional violation against Greenburgh on the claim that its police officers were not authorized to assist in the execution of the Search Order. (Pls.' Mem. in Resp. to Greenburgh 10–16.) In particular, Plaintiffs make much of the fact that the Search Order specified six persons, all Westchester probation officers, who were "authorized" to conduct the search. (*Id.* at 10–11.) Plaintiffs apparently believe that this language implicitly forbade, as a constitutional matter, the Greenburgh police officers from assisting in the search. (*Id.* at 11.) That inference, however, is unwarranted in light of New York law, which states that "[i]n executing a search order ... a probation officer may be assisted by a police officer." N.Y.Crim. Pro. Law § 410.50(5); *People v. Fortunato,* 50 A.D.2d 38, 376 N.Y.S.2d 723, 727 (1975) (noting that police may "bring[ ] matters justifying a search to the probation officer's attention and accompany[ ] him to the search location"). It also is unfounded because the Second Circuit has specifically rejected the claim that a probation officer may not "conduct[ ] a probation search on prior request of and in concert with law enforcement officers." *Newton,* 369 F.3d at 667; *see also Reyes,* 283 F.3d at 462–63. Simply put, probation officers do not need specific permission to seek police assistance in conducting searches, especially where, as here, the target of the search poses a significant threat of violence. *See Newton,* 369 F.3d at 668 ("[W]e [have] approved coordinated activities between probation/parole officers and other law enforcement officials in furtherance of legitimate supervision objectives even though the specific conditions of supervision ... provided for residential intrusions only by a probation officer, with no mention of other law enforcement officials."); *id.* at 667 ("[B]ecause the information suggested ... a not-insubstantial risk that Newton's response to any inquiry might be violent, it was entirely reasonable for the parole officers to solicit the assistance of the police in entering [the] residence."). Therefore, because Plaintiffs have failed to raise any disputed factual issues that might establish their § 1983 claims against Greenburgh, the Court grants Greenburgh summary judgment on these claims.[9]

### 3. Claims Against the Doe Defendants and State Law Claims

The Court has not considered whether Plaintiffs have any viable claims against the Doe Defendants because the only motions before the Court are the municipalities' motions for summary judgment. However, the Court now directs Plaintiffs to show cause why their claims against the Doe Defendants should not be dismissed for failure to prosecute. *See Delrosario v. City of New York,* No. 07–CV–2027, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010) ("Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice."); *Coward*

9. The second cause of action, that Plaintiffs' Fourth Amendment rights were violated because the search was unsupported by probable cause, was asserted only against the individual John Doe defendants. However, even if Plaintiffs could be construed to have included Greenburgh (or Westchester) in this claim, it would be dismissed for the same reasons outlined above: Plaintiffs have tendered no evidence that there was a pattern, practice or policy of executing search orders lacking in probable cause, that there was a specific deficiency in the training of officers who carry out such search orders, or otherwise any link between anything the city (or county) did and any alleged constitutional violation.

494

v. *Town & Vill. of Harrison,* 665 F.Supp.2d 281, 301 (S.D.N.Y.2009) ("Where a plaintiff 'has had ample time to identify' a John Doe defendant but gives 'no indication that he has made any effort to discover the [defendant's] name,' ... the plaintiff 'simply cannot continue to maintain a suit against' the John Doe defendant." (quoting *Kearse v. Lincoln Hosp.,* No. 07–CV–4730, 2009 WL 1706554, at *3 (S.D.N.Y. June 17, 2009))); *Keesh v. Artuz,* No. 97–CV–8417, 2008 WL 3166654, at *2 (S.D.N.Y. Aug. 6, 2008) ("Even after discovery, plaintiff has failed to identify the 'John Doe' and 'Jane Doe' defendants. Accordingly, the complaint against them must be dismissed."). In responding to the order to show cause, the Parties should also address whether, in the event the Court dismisses the claims against the John Doe Defendants, it should also dismiss the remaining state law claims against the municipal Defendants pursuant to 28 U.S.C. § 1367(c). *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction...."); *Grondahl v. Merritt & Harris, Inc.,* 964 F.2d 1290, 1294 (2d Cir.1992) (" '[C]ertainly, if the federal claims are dismissed before trial, ... the state claims should be dismissed as well.' " (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966))).

### III. Conclusion

Accordingly, the Court grants both Westchester's and Greenburgh's motions for summary judgment on Plaintiffs' § 1983 claims. The clerk of the court is respectfully directed to terminate the pending motions (Dkt. Nos. 23–24). The Parties have thirty days from when this order is signed to respond to the Court's order to show cause.

SO ORDERED.